# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Perez*, 2015 IL App (3d) 140876

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF STACEY E. PEREZ, Petitioner-Appellant, and ROBERT A. PEREZ, Respondent-Appellee. |
| District & No. | Third District<br>Docket No. 3-14-0876 |
| Filed | April 3, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 12-D-487; the Hon. Clarence M. Darrow, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Steven N. Peskind, of Peskind Law Firm, of St. Charles, for appellant.<br><br>Robert Perez, of Colona, for appellee. |

JUSTICE CARTER delivered the judgment of the court, with opinion. Justices Holdridge and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1     The petitioner, Stacey E. Perez, appeals from an order of the trial court awarding her and the respondent, Robert A. Perez, equal parenting time under a joint custody order. Stacey also appeals the trial court's decision not to designate her home as the primary residence of the parties' child. We affirm.

¶ 2                                    FACTS

¶ 3     On September 14, 2012, Stacey filed a petition for dissolution of marriage. On December 8, 2012, the circuit court entered a temporary order granting the parties joint legal custody of their child, S.P. The temporary order also gave physical custody of S.P. to Stacey with visitation to Robert every other weekend from 6 p.m. on Friday until 6 p.m. on Sunday, all day on Mondays, and on Thursday evenings from 6 p.m. to 7:30 p.m. Each party agreed to give the other the right of first refusal to have S.P. before a third party was called to care for her.

¶ 4     On March 17, 2014, the circuit court held an evidentiary hearing regarding custody, child support, and maintenance. Respondent requested joint legal custody. Petitioner was not opposed to joint legal custody. Each party argued for primary physical custody.

¶ 5     The evidence showed that the parties were married on May 22, 2010, at which time both parties were employed. The parties resided in the home Stacey had owned prior to their marriage in East Moline. On October 13, 2010, Stacey was laid off from her position as a pharmaceutical sales representative. She gave birth to S.P. prematurely on November 9, 2010. The parties agreed that Stacey would stay home to care for S.P. and Robert would financially support the family through his employment. Other than having a part-time job for a few months, Stacey was a stay-at-home mother for two years. The parties separated in May of 2012.

¶ 6     After the parties separated, Stacey remained in her East Moline home with S.P. She testified that she was under-employed as a part-time beauty advisor earning approximately $16,000 per year. She applied for over 30 positions in the area and took the only job that had been offered to her. In her previous position as a pharmaceutical sales representative she earned close to $80,000. If she could not secure a better paying position in the area, Stacey would either look for employment within a 100-mile radius or return to school in the area to obtain a nursing degree.

¶ 7     Stacey testified that both parties made sure that S.P. was always with one of them, if possible. If both parties were working, S.P.'s paternal or maternal grandparents cared for S.P. Stacey requested primary physical custody of S.P. because S.P. was born and raised in Stacey's home, where S.P. and Stacey still reside.

¶ 8        According to Stacey, she and Robert have done well working together for S.P.'s best interest. Both parties attended S.P.'s wellness visits. They agreed on the preschool that S.P. will attend and the amount of time she will attend per week. They agreed that when S.P. turned four she would attend the preschool full time. The parties also agreed on S.P.'s extracurricular activities. Both parties had extended families in the Rock Island area that see S.P. multiple times throughout the week. Stacey described S.P. as being happy all day long and very intelligent.

¶ 9        During the parties' separation, Robert was living with his parents in Colona. He was employed as a barber for the Illinois Department of Corrections and earned approximately $80,000 per year. Robert worked four days per week, from 7 a.m. to 5:30 p.m., Tuesday to Friday. He also had the flexibility to change to a five-day schedule of 7 a.m. to 3:30 p.m. Robert testified that when Stacey worked as a sales representative her schedule was somewhat sporadic and she sometimes returned home as late as 8 p.m. Robert indicated that he was a very involved father. Robert would take S.P. in addition to his scheduled visitation if Stacey was working. Robert described S.P. as happy and well-adjusted.

¶ 10        Robert was willing to provide Stacey maintenance in support of her returning to school so that she could remain in the area and the parties could share physical custody of S.P. Robert requested that he be given 7 out of 14 overnight visits in a 2-week period. Robert anticipated purchasing a home once he knew the amount of his support obligation. He anticipated S.P. having two homes–one with him and one with Stacey.

¶ 11        S.P.'s maternal grandmother testified that Stacey, Robert, and all of S.P.'s grandparents cooperate well together. She indicated that Stacey and Robert work very well together in parenting S.P. S.P.'s maternal grandmother also testified that Stacey was a very good and consistent parent, and Robert was a "fun" parent. S.P. sees her maternal grandmother almost daily. S.P.'s maternal grandmother described S.P. as happy and content. She believed that S.P. would benefit from remaining in close contact with all her grandparents.

¶ 12        S.P.'s paternal grandmother testified that Robert was a good father. She indicated that Robert and S.P. have bonded deeply. She described S.P. as Robert's "whole world." Robert's brother-in-law described Robert as an excellent father and an ideal parent.

¶ 13        The circuit court found both the parties and the grandparents had been good caregivers for S.P. and commended them for being so cooperative. The court ruled that the parties would have joint legal custody of S.P. with a 50/50 split in parenting time. The court did not specify a parenting scheduling. The judge stated, "I don't know what will work best for the child and the parties as far as three days on, four days on, flip flops, I don't think seven days straight–I'm not going to order that for a child that young." The court found that Robert's child support obligation was $834 and Stacey's was $300 based on their current salaries. The court offset child support and ordered Robert to pay Stacey $534 a month.

¶ 14        The court also found that Stacey made sacrifices in her career to be a stay-at-home mother to S.P. and lost opportunities for advancements in her career. The court awarded Stacey maintenance in gross of $800 per month for 15 months.

¶ 15        On April 9, 2014, Robert filed a motion for mediation to create a new parenting schedule. On July 23, 2014, at the hearing on the motion, Stacey's attorney indicated, "[Stacey] doesn't agree to the shared physical care, so it's irrelevant whatever you order because she's not going to agree to anything in mediation and the case is going up on appeal." The court ruled that in a two-week period, Robert would have S.P. on Monday, Thursday, Friday, Saturday,

Sunday, Monday, and Thursday. Stacey would have S.P. on Sunday, Tuesday, and Wednesday in the first week, and on Tuesday, Wednesday, Friday and Saturday of the following week. The trial court indicated that the hours were to be set to effectuate its order for a 50/50 split in parenting time.

¶ 16   On October 9, 2014, the circuit court entered a judgment of dissolution of marriage and the parties' joint parenting agreement. The judgment of dissolution provided that the parties would have "joint legal custody of their child pursuant to the provisions of a Joint Parenting Agreement." The judgment of dissolution also specified, "the parties will share care of their child 50/50" and listed the same parenting schedule as specified by the court on July 23, 2014. Each party was to give the other party the right of first refusal. As for child support, the judgment of dissolution provided, "[g]iven the fact the Court has ordered 50/50 care, the Court has offset the child support *** and orders that child support will be $534.00 per month going forward."

¶ 17   The parties' joint parenting agreement indicated that the court had ordered "joint legal custody" and further ordered "joint care of the child." The agreement specified, "Each parent will have an equal voice in decisions relating to the child's education, religious upbringing, physical, mental, emotional and social development." If the parties were unable to reach an agreement, the parties were to resolve the dispute by reducing their positions to writing, engaging in a discussion, and going to mediation if necessary.

¶ 18   Stacey appealed.

¶ 19                                ANALYSIS

¶ 20   On appeal, Stacey does not take issue with the trial court's award of joint custody. Rather, Stacey argues that the trial court erred in splitting the parties' parenting time 50/50 and by failing to designate her home as the primary residence of S.P.

¶ 21   The Illinois Marriage and Dissolution of Marriage Act (Act) shall be liberally construed and applied to promote its underlying purposes, which includes securing the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children before and after litigation. 750 ILCS 5/102 (West 2012). "The court shall determine custody in accordance with the best interest of the child." 750 ILCS 5/602 (West 2012).

¶ 22   Under the Act, "dissolution of marriage *** shall not diminish parental powers, rights, and responsibilities except as the court for good reason may determine." 750 ILCS 5/602.1(a) (West 2012). Either party can move for an award of joint custody, or the court can consider an award of joint custody upon its own motion. 750 ILCS 5/602.1(b) (West 2012).

¶ 23   "The court may enter an order of joint custody if it determines that joint custody would be in the best interests of the child, taking into account the following: (1) the ability of the parents to cooperate effectively and consistently in matters that directly affect the joint parenting of the child ***; (2) [t]he residential circumstances of each parent; and (3) all other factors which may be relevant to the best interest of the child." 750 ILCS 5/602.1(c) (West 2012). Joint custody should be awarded only where the evidence indicates the parents are willing to cooperate in the upbringing of their child. See *In re Marriage of Marcello*, 247 Ill. App. 3d 304 (1993) (affirming joint custody over the mother's objection where the father was involved in the child's activities, the mother testified the father should not be excluded

- 4 -

from major decisions, and the parents live in close geographical proximity); *In re Marriage of Seitzinger*, 333 Ill. App. 3d 103 (2002) (affirming an award of joint custody where there was evidence that both parents had a great deal of involvement in the child's life during their marriage, both parents desired to continue the same level of involvement, and ample evidence showed the parties' ability to cooperate); *cf. In re Marriage of Hacker*, 239 Ill. App. 3d 658 (1992) (affirming joint custody order where evidence showed the parents were able to cooperate but reversed and remanded for a new schedule where there was no evidence that shared physical custody of a week back and forth was workable or in the best interest of the children).

¶ 24 The trial court has broad discretion in fashioning a custody decree in the best interest of a child. *Davis v. Davis*, 63 Ill. App. 3d 465, 469-70 (1978). In custody cases, a strong presumption favors the result reached by the trial court because of the trial court's superior opportunity to observe and evaluate witnesses when determining the best interests of the child. *Shinall v. Carter*, 2012 IL App (3d) 110302, ¶ 30. Therefore, we will not disturb a trial court's custody award unless the court abused its discretion or its factual determinations are against the manifest weight of the evidence. *Id*.

¶ 25                                   I. Equal Shared Parenting Time

¶ 26 Stacey claims that the trial court erred in awarding equal parenting time under the joint custody order because equal parenting time is disfavored under Illinois law. In support of her contention, Stacey cites to section 602.1 of the Act, which provides, "Nothing within this section shall imply or presume that joint custody shall necessarily mean equal parenting time." 750 ILCS 5/602.1(d) (West 2012).

¶ 27 A reading of the plain language of the statute indicates that the statute neither mandates nor precludes equal parenting time in a joint custody situation. See *In re Parentage of Rocca*, 408 Ill. App. 3d 956, 964-65 (2011) (courts read a statute to effectuate the legislature's intent and, to do so, look first to the plain language of the statute). While equal parenting time is not required in joint custody situations, the court's equal parenting schedule was not prohibited by the statute.

¶ 28 In this case, the parties demonstrated the extraordinary level of cooperation required for a joint parenting arrangement. Both parties were heavily involved in S.P.'s life and each wished to maintain his or her level of involvement. The trial court found that it was in the best interest of S.P. to maintain maximum involvement of both parties and S.P.'s extended family. S.P. was described as a happy and content child during the time parties were separated and abiding by the temporary schedule.

¶ 29 The trial court's 50/50 shared physical custody schedule was similar to the temporary every-other-weekend schedule with the addition of a few more overnight visits for Robert and the extension of Robert's Thursday evening visit to an all-day visit. The 50/50 schedule allows Robert to have S.P. on his Mondays off from work and every other weekend from Thursday to Monday, and again on Thursday of the second week. The schedule would allow Stacey to have S.P. every Tuesday and Wednesday, and every other weekend from Friday through Monday morning. Robert having an overnight visit on his Sundays avoids the need to shift S.P. back to Stacey for the night just to return her to Robert again on Monday morning. Similarly, Robert having an overnight visit on Thursday avoids the need for Robert to return S.P. to Stacey for the night just to pick her up again the following day for his

weekend. The schedule also allows each party to equally share in the responsibility of getting S.P. to daycare or school while maintaining his or her own job.

¶ 30    Stacey cites *Davis*, 63 Ill. App. 3d 465, and *In re Marriage of Oros*, 256 Ill. App. 3d 167 (1994), in support of her contention that Illinois law disfavors alternating or rotating custody arrangements in favor of stability and consistency. In *Davis*, the Fifth District Appellate Court held that where the minor children indicated feelings of insecurity and divided loyalty due to overriding hostility between the parents, an order providing for physical custody of the children to shift every four months was an abuse of discretion. *Davis*, 63 Ill. App. 3d at 469-70. In *Oros*, the Fourth District Appellate Court found that the trial court abused its discretion in allowing a joint custody order to continue where the young child rotated between his parents every three months. In that case, the parties lived an hour apart and evidence indicated the child experienced confusion and emotional problems during the three years that he had been subjected to a changing of preschools, doctors, playmates, household, and environments every three months. *Oros*, 256 Ill. App. 3d at 170.

¶ 31    Stacey additionally cite*s In re Marriage of Swanson*, 275 Ill. App. 3d 519 (1995), for the proposition that the court's custody order must give some permanency to the physical custody of the children and not simply attempt to equalize the time the children spend with each parent. In *Swanson*, the trial court awarded the parties joint custody of their seven-year-old twin boys, with primary residency to the mother and allowing the father visitation for the last 14 days of every month. The *Swanson* court reversed the award of joint custody, noting that "[j]oint custody requires an unusual level of cooperation and communication from both parents" and the parties were not able or willing to cooperate with each other to the extent required for joint parenting. *Id.* at 524.

¶ 32    Here, the trial court did not order the equal division of physical custody in an attempt to equalize parenting time between the parties as in *Swanson*. Instead, the court found it was in S.P.'s best interest to fashion its custody order to maximize the involvement of both parties. The instant case is also distinguishable from *Davis* and *Oros*. In this case, the parties live in close proximity to one another so that S.P. is able to maintain the same doctors, dentist, school, playmates, and extended family connections. Also, the evidence showed that the schedule was workable in that it was only slightly modified from the temporary order that had been working successfully for the parties and S.P.

¶ 33    We acknowledge that courts have traditionally viewed 50/50 shared parenting schedules with caution. See *Hacker*, 239 Ill. App. 3d 658 (remanding for the joint custody order to give some permanency to the physical custody of the children). However, on the facts of this case, the trial court did not abuse its discretion in establishing the 50/50 shared parenting schedule. In this case: (1) Robert and Stacey are both capable parents; (2) Robert and Stacey were cooperative and could reached shared decisions together in the best interest of S.P.; (3) they lived in close proximity to each other so as not to disrupt S.P.'s schooling, connections, and community ties; (4) the schedule accounted for the parties' work schedules and was working well; (5) S.P. was described as a happy child with no indication that she would suffer psychologically or emotionally under the 50/50 shared parenting schedule; (6) neither party's residence was unsuitable for S.P.; and (7) S.P. did not have a strong preference, based on her best interest, against the 50/50 schedule. Therefore, based on the specific facts presented at this time, the trial court's finding that the 50/50 shared parenting schedule was in the best interest of S.P. was not against manifest weight of the evidence.

¶ 34                                    II. Primary Residence Designation

¶ 35        Next on appeal, Stacey argues that the trial court erred in failing to designate her home as
S.P.'s primary residence where the evidence showed that she had been S.P.'s primary
caregiver since S.P.'s birth. Stacey requests that this court designate her as S.P.'s "residential
custodian" and allow Robert to have visitation with S.P.

¶ 36        In this case, neither the joint parenting agreement nor the dissolution judgment specifies a
"primary" residence for S.P. Stacey contends that section 602.1(d) of the Act requires the
determination of a primary physical residence. Section 602.1(d) provides:
                "Nothing within this section shall imply or presume that joint custody shall
                necessarily mean equal parenting time. The physical residence of the child in joint
                custodial situations shall be determined by:
                        (1) express agreement of the parties; or
                        (2) order of the court under the standards of this Section." 750 ILCS
                5/602.1(d) (West 2012).

¶ 37        As we discussed above, the plain language of section 602.1 does not preclude equal
parenting time. We additionally do not read the language of section 602.1 as requiring the
designation of a "primary" physical residence. See *Kic v. Bianucci*, 2011 IL App (1st)
100622 (no abuse of discretion where the trial court's joint custody order was silent as to the
designation of a primary residential parent); *cf. In re Marriage of Davis*, 341 Ill. App. 3d 356
(2003) (finding a change in circumstance occurred to support a hearing on the mother's
motion to modify the joint custody agreement wherein the parties equally shared parenting
time and neither home was designated as the child's primary residence). The language of
section 602.1 only requires that, in joint custody situations, the physical residence of the
child be determined in an expressed agreement or order of the court.

¶ 38        Here, the trial court followed the requirements of section 602.1(d) for determining the
physical residence of S.P. by designating which days S.P. would reside with each parent in
its judgment of dissolution. We understand that selecting a "primary" residential parent could
have certain ramifications. See, *e.g.*, *Portman v. Department of Human Services*, 393 Ill. App.
3d 1084 (2009) (interpreting the term "custodial parent" in a regulation for receiving child
care assistance as excluding a divorced father, even though he had joint legal custody and
equal parenting time, where the mother was designated the primary residential parent). In this
case, the parties live in close proximity to one another, share joint legal custody and equal
parenting time, and cooperate in pursuing the best interests of S.P. Given the facts of this
case, the trial court acted within its discretion in deciding to forgo designating either parent
as the "primary" residential custodian.


¶ 39                                                CONCLUSION

¶ 40        For the foregoing reasons, the judgment of the circuit court of Rock Island County is
affirmed.


¶ 41        Affirmed.