2021 IL App (3d) 190650

Opinion filed May 5, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| RACHAEL VIRGIN n/k/a Rachael Ford, | ) | Will County, Illinois, |
| | ) | |
| Petitioner-Appellee, | ) | Appeal Nos. 3-19-0650 |
| | ) | 3-19-0788 |
| and | ) | Circuit No. 15-D-340 |
| | ) | |
| JUSTIN VIRGIN, | ) | Honorable |
| | ) | Elizabeth Hoskins Dow, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Presiding Justice McDade concurred in the judgment and opinion.
Justice Lytton concurred in part and dissented in part, with opinion.

_____

**OPINION**

¶ 1        The respondent, Justin Virgin, filed a motion for modification of parenting time as to his

minor child, C.V. (born February 2013), that he shares with the petitioner, Rachael Virgin n/k/a

Rachael Ford. Rachael filed a petition for indirect civil contempt. Following a hearing, the circuit

court modified parenting time and held Justin in indirect civil contempt. Justin appeals.

¶ 2                                    I. BACKGROUND

¶ 3        The parties were married on April 26, 2012. They share one child together, C.V. In

February 2015, Rachael filed a petition for dissolution of marriage citing irreconcilable

differences. In November 2016, the circuit court entered a judgment for dissolution of marriage and incorporated an agreed order allocating parental responsibilities as to C.V. Among other things, the order provided that Justin must maintain medical insurance for C.V. and Justin and Rachael had joint decision-making as to all matters.

¶ 4 The parties agreed to an unconventional parenting time schedule as to three-year-old C.V. Justin was provided parenting time on Monday, Tuesday, and Wednesday from 7:30 a.m. until 6:00 p.m. The parties also alternated weekends. On Justin's non-visitation weekend, he would have parenting time on Thursday from 7:30 a.m. until Friday 6:00 p.m. On Justin's visitation weekends, he would have parenting time on Thursday from 7:30 a.m. until Monday 7:30 a.m. Rachael was provided overnight weekend visitation on alternating weekends from Friday at 6:00 p.m. through Monday at 7:30 a.m. Over a two-week period, this schedule allotted Justin five overnights and Rachael nine overnights. Nonetheless, the order designated Justin as the custodial parent with majority parenting time for purposes of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/606.10 (West 2016)) but made clear that the parties had equal parenting time.

¶ 5 A. Justin's Motion for Modified Parenting Time

¶ 6 In September 2018, Justin filed, among other things, a motion for modification of parenting time (750 ILCS 5/610.5(c) (West 2018)). He alleged that there had been a substantial change in circumstances since the dissolution judgment was entered. Justin contended that the following behaviors or events occurred that were not in C.V.'s best interest: (1) gang members were known to frequent Rachael's home, and C.V. had begun to "throw" the Vice Lords sign; (2) the bedtime schedule at Rachael's residence was not enforced, and C.V. spent a significant amount of time catching up on sleep by napping at Justin's residence and had trouble going to sleep on time at Justin's residence; (3) Rachael did not have appropriate sleeping arrangements for C.V. as he

2

shared a room with her and her fiancé and frequently shared a bed with them; (4) brushing teeth before bed was not encouraged or enforced at Rachael's residence, C.V. had several cavities filled because of this negligence, and the dentist had sent letters regarding the importance of brushing his teeth; (5) Rachael did not provide a safe environment as she and her fiancé frequently fought in front of C.V., which sometimes became physical; (6) in August 2018, C.V. stated he was afraid following a fight where Rachael's fiancé threw chairs around and flipped a patio table; (7) Rachael allowed C.V. to watch programs on the television that were inappropriate for his age; (8) Rachael forgot C.V.'s first day of school despite a reminder from Justin; (9) Justin attempted to resolve conflicts with Rachael and she refused; (10) Rachael had taken C.V. to mental health/therapy appointments without giving Justin notice; (11) Rachael declined to provide the information of the doctors or therapists associated with such appointments despite requests; and (12) Rachael declined to effectively participate with C.V.'s primary care provider or counselor and did not attend appointments. Justin also provided in his motion that he obtained new employment that allowed for increased parenting time.

¶ 7 Attached to Justin's petition were exhibits showing communication between the parties regarding C.V.'s sleep routine, a letter from C.V.'s dentist office with dental care recommendations, and a photo of C.V. using a purported gang sign. The court entered an order appointing a guardian *ad litem* (GAL), and the matter was continued due to various other filings.

¶ 8 B. Rachael's Petition for Indirect Civil Contempt

¶ 9 Thereafter, Rachael filed a petition for indirect civil contempt against Justin. She alleged that he did not provide C.V. with health insurance from January 1, 2018, through February 28, 2018, and June 1, 2018, through August 31, 2018, per the agreed order and the current coverage was in danger of cancellation due to Justin's failure to pay the premium. Rachael also contended

3

that Justin did not submit all of C.V.'s health care expenses to the insurance carrier for payment, which unnecessarily increased the shared out-of-pocket costs. She requested that the court issue a rule to show cause, modify parental responsibilities to require that she provide health insurance coverage for C.V., order Justin to reimburse her for all related costs, and grant her costs and attorney fees. Rachael did not attach any supporting documentation to her petition.

¶ 10                                                     C. Hearing

¶ 11        In September 2019, the court held a hearing on the pending matters. At the time of the hearing, C.V. was 6½ years old. We limit our discussion to the issues of parenting time during C.V.'s school year and civil contempt as those are the only issues raised on appeal.

¶ 12                                          1. GAL's Testimony

¶ 13        The GAL testified that this case presented one of the more extreme examples of high conflict families of any cases that he had been involved with either as an attorney or a GAL. He detailed there had been around six orders of protection, investigations by the Department of Children and Family Services (DCFS), criminal proceedings, and mutual restraining orders. The GAL stated that the only way the parties could communicate was through a coparenting communication tool called Talking Parents. He opined that the lack of communication and inability to reach an agreement worked to the detriment of C.V. where failed communications resulted in either a delay or no resolution for C.V.'s counseling, health care, and school matters.

¶ 14        The GAL recommended that C.V. continue counseling on a weekly basis at a time when both parties could attend. The providers all agreed that C.V. should be seen on no less than a weekly basis because he struggled significantly with the conflict between the parties and anxiety. The GAL also recommended that the parties start seeing a separate counselor to assist them in improving their communication, resolve their issues, reach a consensus with parenting matters,

4

and create a neutral line of communication with C.V.'s counselor. After a year's time, either party could petition the court to discontinue use of that counselor. The GAL stated that his file was full of examples of this type of harassing, threatening, or demeaning communication. When he asked Rachael about instances demonstrating her lack of communication, she stated that she was inundated with unproductive communication. The GAL agreed that there was a lot of unnecessary aggressive, harassing communication and an overwhelming majority of the time Justin was aggressive and antagonistic toward Rachael. He even saw this type of communication occur with school officials and believed it would deter individuals from helping C.V.

¶ 15    The GAL also recommended that the parties be prohibited from exposing C.V. to inappropriate media and instruct third parties residing in their homes and visitors of this restriction. He noted that Rachael's household had several older siblings, and C.V. was exposed to inappropriate media both in movies and video games. This suggestion was based on a counselor's recommendation to try to minimize C.V.'s aggressive behaviors. The GAL noted an issue involving a minor, J.M., who was a friend of one of C.V's older siblings in Rachael's home. J.M. was consistently physical with C.V., including hitting him on the head and putting him in choke holds. This added to C.V.'s anxiety. A motion and agreed order followed where J.M. was not to be in Rachael's home during her parenting time. After the entry of this order, C.V. notified his counselor that J.M. still appeared during Rachael's parenting time but was outside of the residence. Therefore, the GAL recommended that J.M. should not be permitted on the premises, anywhere near the home, inside, or outside, during the parenting time.

¶ 16    The GAL next addressed the parenting schedule. He noted that at the time the dissolution judgment was entered, C.V. was not in school. Since then, he started kindergarten. The GAL discussed the current schedule with C.V.'s counselors, which required him to go to one household

from 6 p.m. to bedtime then wake up just to return to the other parent's house. Neither counselor provided any specific recommendation on this issue. The GAL noted that C.V. had issues with his sleep and behavior and felt that a change in the schedule could make C.V.'s life better. He recommended that C.V. be with Justin during the school year from Monday evening through Thursday morning. On Thursday evening, Rachael would have C.V. overnight until Friday morning. If it was Rachael's weekend, she would have Thursday evening through Monday morning. During the summertime, he recommended that Justin have every Monday and Tuesday and that Rachael have every Wednesday and Thursday with the parties alternating weekends.

¶ 17        First, the GAL explained that he recommended that Justin have his parenting time throughout the week to assist C.V. with some of his sleep issues. He noted past communications where Rachael stated that C.V. had been sleeping in a bedroom with her and her boyfriend for several years. The parties provided conflicting accounts as to whether C.V. was actually sleeping in the same bed as Rachael and her boyfriend and whether C.V. had slept on the floor. The GAL recalled a conversation with Rachael where she said the situation would be remedied and it had not. He recalled another conversation where Rachael said it would be remedied when her boyfriend's 17-year-old daughter went off to school as there would be a shift in sleeping arrangements in the household. At the time of the hearing, it was unclear if there had been a resolution. The GAL believed that C.V.'s sleep should have been prioritized because mental health professionals indicated C.V. had sleep issues and needed to get better sleep, improve his mood and behaviors, and address his fears of sleeping alone. He noted that there were six individuals in Rachael's home other than C.V.: Rachael, her boyfriend, her boyfriend's daughter, and three children from a prior relationship. Additionally, Justin consistently put C.V. to bed around 8 p.m., and bedtime at Rachael's home was inconsistent and sometimes as late as 9 p.m. or 10 p.m.

6

Therefore, he believed Justin's household presented a better situation to ensure C.V. would sleep better.

¶ 18    Second, the GAL based this recommendation on his opinion that Justin took on the majority of the caretaker functions since the entry of the dissolution judgment. He noted that, although Justin was aggressive and demeaning toward Rachael, he was making the appointments with doctors, asking for follow through, and asking for consistency. The GAL mentioned that C.V. had significant issues with his teeth and that he suffered from bronchitis during the course of the proceedings. The parties fought over C.V.'s need to have his ears drained, and C.V.'s provider indicated that had C.V. received care sooner, his croup cough would not have developed into bronchitis. Nonetheless, the GAL stated that Justin was the parent making the appointments, contacting providers, and bringing C.V. to the appointments. He believed Justin provided enough advance notice most of the time, but that Rachael needed to understand that he cannot always schedule appointments when she can take off work. The GAL did not believe there was flexibility with Rachael's work because she stated she could not attend counseling at 4 p.m. without losing two hours of work. In contrast, at the time of his report, Justin was off work for medical reasons.

¶ 19    Third, the GAL discussed the other parties present in each household. When Justin had been working, he was a chef where he worked doing prep work during the day, on Friday and Saturday evenings, and sometimes part of the day on Sundays. Justin's retired mother was often at Justin's home and played an active role in C.V.'s life when Justin was not available. On the other hand, one of C.V.'s counselors expressed concerns about Rachael's boyfriend. The GAL mentioned a criminal proceeding involving the boyfriend and C.V. that was ultimately dismissed. C.V. said that the boyfriend was mean to him and called him a "sissy" when C.V. asked him to read a book. He also mentioned allegations that there were fights between Rachael and her

7

boyfriend in C.V.'s presence. The GAL recommended that, during the periods that C.V. would need care when both parties would be working, either Justin's mother or fiancée provide care.

¶ 20                                    2. Justin's Testimony

¶ 21        Justin testified that he shared one child, C.V., with Rachael. He shared a household with his fiancée, who was pregnant with their first child together, and her two kids that were five and seven years old. Both of the children were in school with C.V. Justin's mother would occasionally stay the night on weekends if C.V. was there. When Justin was not available during the day, typically for only an hour or two, either his fiancée or his mother would watch C.V. At the time of the hearing, Justin was employed as a photojournalist and worked from home. His editor would call him to check out stories and his time from home varied, but his work schedule was flexible.

¶ 22        Justin described C.V.'s regular school day. Rachael would drop C.V. off at his home between 7:20 a.m. and 7:30 a.m. They would not do too much, but if C.V. was hungry, he would feed him breakfast. Sometimes he would eat with Rachael. At 8:15 a.m., Justin would take him to the school located down the street. He would then pick C.V. up from school at 3:30 p.m. When they would get back home, C.V. would have a snack and then they would work on homework. The homework could take anywhere between 45 minutes to 1 hour. Justin stated that he was primarily in charge of C.V.'s homework. After homework, Justin would make dinner. This left around 30 minutes to play outside or do something else until Rachael picked C.V. up at 6 p.m.

¶ 23        Justin stated that he provides the caretaking function for C.V. He takes C.V. to get his haircut, doctor's appointments, and school. He stated he was generally the one to make doctor's appointments because Rachael often takes too long to respond. Justin also stated that, if C.V. requires immediate medical attention, he makes the appointment. He also recalled a situation when Rachael was supposed to take C.V. to a Saturday appointment because C.V. was sick and needed

to follow up with his doctor to review his use of prescription cough medication. The doctor's office called Justin to inform him that C.V. missed the appointment, and he had to reschedule it. He later learned that Rachael missed the appointment because she had an emergency situation with her dog. Justin also stated that Rachael did not follow prescription recommendations from C.V.'s doctor. He stated that he once sent a 10-day supply of antibiotics with C.V. to Rachael's home and when C.V. returned to his house after seven days he had no medication left. Justin asked Rachael about the remaining three days of medication, and she stated that it was all gone. There appeared to be confusion around the dosage C.V. was to receive per day.

¶ 24        Justin provided that C.V. suffers from anxiety and that he uses an inhaler as needed for allergies and upper respiratory issues. C.V. did not use the inhaler while at Rachael's home as indicated by the counter on the inhaler that provides how many uses had been administered. Justin detailed that Rachael ignored his advice on how to administer it to C.V. He had concerns that C.V.'s best interest was not considered and that Rachael caused problems to make a point. Justin admitted that their communication was poor and that he does not always communicate properly. He expressed that his frustrations stemmed from Rachael's unresponsiveness to medical decisions, and he referenced an instance where it took three months to get a response on a counseling matter that required joint decision making. However, Justin made clear that he does not involve C.V. with his conflict with Rachael because it is not C.V.'s problem. He stated, "no matter how much we may hate each other, the best interest and [C.V.] being okay is what's important." To exemplify that he does not involve C.V, Justin recalled an incident where Rachael forgot to attend "Muffins with Mom" at C.V.'s school. Rachael told Justin she forgot to attend. Instead of telling C.V. that Rachael forgot, he told C.V. that she had to work and could not make it.

¶ 25        Justin also described C.V.'s counseling schedule. At the time of the hearing, C.V. had a

standing appointment with his counselor for every Tuesday at 4 p.m. The counseling center required a six-month commitment for a standing appointment. Justin stated that he had a problem with Rachael taking C.V. to these appointments because several counselors have stated that C.V. says things about Rachael during counseling, and he did not want C.V. to think he was going to be in trouble for saying these things or that anyone would be mad at him. However, if a counselor recommended that Rachael take C.V. to some of these appointments, he would be okay with it. Justin also testified about C.V.'s school. C.V. had been taking two extra bathroom breaks a day for bowel movements, which his doctor suspected was due to anxiety and nervousness.

¶ 26       Last, Justin discussed his concerns with Rachael's home. Generally, he was concerned that there was a lack of supervision. Justin also believed that he shared a bed with his 12-year-old brother in the basement. This concerned him because C.V.'s doctor stated that the basement could exacerbate his asthma and upper respiratory issues, and he missed 15 days of school last year for these issues. Additionally, he did not believe it was functional for a six-year-old to share a bedroom with a 12-year-old when he needed to be in bed by 8 p.m. Before this sleeping arrangement, he believed C.V. was sharing a bed with Rachael and her boyfriend. C.V. reported several times that he saw Rachael's boyfriend naked and that he saw Rachael and her boyfriend shower together.

¶ 27       Regarding the GAL's recommendation, Justin did not agree with the Sunday night recommendation and believed that C.V. should be with him on Sunday night prior to school starting. Other than that, he asked the court to adopt the GAL's recommended schedule.

¶ 28                              3. Rachael's Testimony

¶ 29       Rachael testified that she was C.V.'s mother. She worked full time and also attended online school with a goal to work in health care. She lived in a home with three of her other children and her fiancé. Rachael's home was approximately six minutes away from Justin's home. As to the

living arrangements, two of the girls share a bedroom, and C.V. shared a room with his 12-year-old brother in the basement. C.V. would go to bed around 8:30 or 9 p.m. but liked to try to stay up later. Prior to this arrangement, C.V. slept on his own bed in Rachael's bedroom that she shared with her fiancé. She stated that she and her fiancé would go to bed around 10 p.m., about two hours after C.V. went to bed. Rachael had no concerns about C.V. sleeping in the basement. She believed C.V. needed counseling to an extent but believed that his behavior was typical for a child his age. Rachael stated that, in the past, she did not feel that she was timely informed regarding C.V.'s progress in school, but she receives updates now without issue. She stated she did not attend the school's curriculum nights this year or last year, orientation for kindergarten, school musicals, or "Muffins with Mom." Rachael also noted one time the school called her to pick up C.V. because he was sick but Justin ended up picking him up. During her free time with C.V., they often play basketball, color, and go to the movies.

¶ 30        Rachael expressed interest in attending C.V.'s appointments if they were scheduled when she was off work. Her work schedule was Monday through Friday from 8:00 a.m. to 5:00 p.m. Rachael also recalled the incident where she was supposed to take C.V. to a doctor's appointment but missed it due to an emergency with her dog. She stated that by the time she realized they missed the appointment the office was closed and she could not reschedule. Rachael agreed with the GAL's recommendation to keep a consistent schedule for C.V.'s counseling but stated that she could only take him in the evening or on weekends. She stated if Justin or somebody else could take C.V., that would be agreeable, but she wanted to be informed. Rachael disagreed with the GAL's assessment that her work schedule lacked flexibility because she could take C.V. to school in the mornings by arriving to work later than usual but then taking a shorter lunch break. Rachael provided a letter from her employer providing this flexibility.

11

¶ 31    Rachael stated that she had been in a relationship with her fiancé for almost four years and had lived with him for three years. He did not have a criminal record and had never been found as abusive or neglecting a minor by DCFS. She had five or six DCFS complaints lodged against her, all of which were related to C.V. and unfounded.

¶ 32    In the event the court changed the schedule to give Rachael parenting time after school, she would enroll C.V. in the after-school program at the YMCA until she was off work two hours later. She mentioned this option to Justin but did not recall his response. Regarding the GAL's parenting time recommendation, she felt that it would deprive her of the one hour she spent with C.V. on school mornings and two hours between when she gets off work and C.V.'s bedtime. Rachael asked that the court make no changes to the parenting time schedule.

¶ 33                              D. Health Insurance

¶ 34    Rachael argued that there were two instances where C.V.'s health insurance coverage lapsed from January 1, 2018, through February 28, 2018, and June 1, 2018, through August 31, 2018. Justin stated that he had health insurance for C.V. at the time of the hearing that he purchased through the health insurance marketplace. However, Justin stated "[t]here might have been" a lapse in coverage because he switched carriers when his premium increased. Neither Rachael nor Justin were aware of any expenses that incurred due to a lapse in coverage.

¶ 35                              E. The Court's Order

¶ 36    The court entered a written order finding Justin in indirect civil contempt and ordered that "purge for [Rachael's contempt petition] shall be payment of any costs incurred during specific lapses in coverage, if any, to be made 100% by [Justin]. And for [Justin] to continue maintaining coverage for [C.V.]" The court stated on the record that there would have to be a future hearing to resolve any costs or attorney fees. The court then took the issue of parenting time under advisement

12

but believed that a modification of overnights was warranted. It noted that both parties parented well but were unsuccessful in coparenting. The court provided that it was most concerned with C.V.'s sleep and school schedule.

¶ 37    Thereafter, the court held a status hearing and provided a copy of its modified parenting time order, wherein it ordered alternating weekends starting after school on Friday through drop-off at school on Monday morning; the parent that did not have parenting time the proceeding weekend would have parenting time from start of school Monday until the start of school on Wednesday morning and the parent that had parenting time on the weekend in the proceeding weekend would have parenting time from the start of school on Wednesday morning until the release of school on Friday afternoon.[1] In essence, this modification changed the parenting time to provide a true 50/50 schedule (seven overnights for each parent over a two-week period). Before this modification, Rachael had nine overnights and Justin had five overnights over a two-week period. Notably, the schedule ordered by the court deviated from the GAL's recommendation, which would have swapped the parties' overnights from the original agreement where Justin would have had nine overnights and Rachael would have had five overnights over a two-week period.

¶ 38    The court also entered a supplemental order on parenting issues providing that (1) the parties shall attend parenting counseling once a month for six months to assist with their communication; (2) C.V. was to continue with his current counselor at the frequency and duration of the counselor; (3) a $300 penalty fee is imposed for instances where either party is guilty of harassing, threatening, or demeaning the other parent in a communication with/to each other or a

---

[1] The court's order provided that the parties "agree" to the new parenting time schedule. The parties agree on appeal that parenting time was an item of contention, and they never reached an agreement, which is supported by the record before us. This appears to be nothing more than a typographical error, especially as the court asked for a template from the prior judgment, which *was* reached by agreement. Therefore, we will treat the judgment as one decided by the court without an agreement by the parties.

13

third party associated with C.V.; (4) J.M. shall not be permitted on Rachael's premises or in her household during her parenting time; and (5) the new schedule was effective November 1, 2019.

¶ 39    After the court explained the orders, it asked the parties if there were any pending matters that needed a future date. Justin's counsel informed the court that she had a pending motion regarding allocation of the GAL's fees. Rachael's counsel asked for limited discovery for the financials as it pertained the GAL fees, and Justin's counsel agreed to provide an updated financial affidavit. The court then held a hearing and divided the GAL fees. Justin appeals.

¶ 40                                    II. ANALYSIS

¶ 41    Justin raises two arguments on appeal: (1) the circuit court's parenting time order was against the manifest weight of the evidence and (2) the court erred when it found him in indirect civil contempt. Rachael argues that the court's decisions were proper.

¶ 42                                A. Parenting Time

¶ 43    Parenting time may be modified upon a showing that a substantial change has occurred in the circumstances of the child or of either parent and modification is necessary to serve the child's best interests. 750 ILCS 5/610.5(c) (West 2018). Upon such a showing, the court must allocate parenting time according to the best interest of the child. 750 ILCS 5/602.7(a) (West 2018).

¶ 44    In allocating parenting time, the court shall consider all relevant factors, including (1) each parent's wishes; (2) the child's wishes; (3) the amount of time that each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to caretaking functions; (5) the interaction and interrelationship of the child with his parents and siblings and with any other person who may significantly affect his best interests; (6) the child's adjustment to his home, school, and community; (7) the mental and

14

physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, the parents' and child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; (12) each parent's willingness and ability to place the child's needs ahead of his or her own; (13) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other member of the child's household; (15) whether one parent is a sex offender or resides with a sex offender; (16) the terms of the parent's military family-care plan if a parent is a member of the United States Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.7(b) (West 2018).

¶ 45    The circuit court is in the best position to assess the credibility of witnesses and to determine the child's best interest, so we afford its allocation of parenting time great deference. *In re Marriage of Lonvik*, 2013 IL App (2d) 120865, ¶ 33. Due to this deference, we will not disturb a circuit court's determination concerning the allocation of parenting time unless it is against the manifest weight of the evidence. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). With that being said, the discretion of the circuit court is not boundless, and it is the duty of the reviewing court to reverse a decision that is contrary to the manifest weight of the evidence. *In re Marriage of Bush*, 170 Ill. App. 3d 523, 529 (1988).

¶ 46    Justin argues that the court's order of 50/50 joint parenting time is against the manifest weight of the evidence. He recognizes that 50/50 arrangements can be appropriate but argues that the circumstances of this case warrant a different conclusion.

15

¶ 47    This court has acknowledged that courts have traditionally viewed 50/50 joint parenting time with caution. *In re Marriage of Perez*, 2015 IL App (3d) 140876, ¶ 33. In cases where the evidence clearly showed that parents had too much animosity to be able to cooperate, 50/50 arrangements have been set aside. See *In re Marriage of Drummond*, 156 Ill. App. 3d 672 (1987); *In re Marriage of Bush*, 191 Ill. App. 3d 249 (1989); *In re Marriage of Swanson*, 275 Ill. App. 3d 519 (1995). However, where the record shows that the parties are reasonably loving and capable parents who are sufficiently able to cooperate even though each party attempted to prove the other was less capable, the 50/50 arrangement *could be* upheld. See *In re Marriage of Hacker*, 239 Ill. App. 3d 658, 661 (1992); see also *Perez*, 2015 IL App (3d) 140876 (the parties were cooperative and could reach shared decisions together in the best interest of the child).

¶ 48    Here, the modified joint parenting order continued to name Justin as the custodial parent but established a 50/50 schedule where C.V. would move between Justin and Rachael's homes midweek and every other weekend. Under the circumstances presented, we view this alternating schedule with disfavor and find that it is not in C.V.'s best interest. See *In re Marriage of Oros*, 256 Ill. App. 3d 167, 169 (1994) (joint arrangements "in all but rare instances engender dissension between the parties and instability in the child's environment").

¶ 49    First, the record is replete with evidence that the parties have too much animosity to sufficiently cooperate. The GAL testified that this case presented one of the highest conflict cases he had ever seen in his experience as a GAL and attorney. He described that there had been around six orders of protection, multiple DCFS investigations, criminal proceedings, and mutual restraining orders. The GAL also described the parties' communication as unproductive, which is clearly supported by the record. While the court believed that both Justin and Rachael parented well, it acknowledged that they did not coparent well. Perhaps the most alarming example of this

16

failure to coparent is an opinion from C.V.'s medical provider who stated that had C.V. received care for his croup cough sooner, it would not have developed into bronchitis.

¶ 50     We recognize that the court entered a supplemental order on parenting issues, ordering that a $300 penalty shall be imposed for each instance a parent is guilty of harassing, threatening, or demeaning the other parent in a communication with/to each other or a third party associated with the child. Although this provision has a purpose of providing more effective communication between the parties, it does not eliminate the high conflict environment, it only penalizes it monetarily. The court also ordered the parties to attend parenting counseling for six months to assist with their communication. We have no evidence that this attempt to mend the communication between the parties will be successful, and a schedule must be implemented based on the current circumstances.

¶ 51     Second, this alternating schedule failed to address C.V.'s needs and health, and Justin's course of conduct relating to caretaker functions. The evidence demonstrated that C.V. has substantial needs that require thoughtful consideration: he suffered from anxiety, asthma, and upper respiratory issues; struggled with the conflict between his parents; had behavioral problems; and had sleep issues. Also, the record undeniably demonstrates that Justin primarily provided the caretaking functions, such as helping C.V. with his schoolwork, scheduling and transporting to medical and counseling appointments, and managing his medication. The dissent does not deny Justin's significant role as C.V.'s primary caretaker but, instead, states we failed to consider Justin's willingness to facilitate and encourage a close and continuing relationship between Rachael and C.V. and this factor lends in favor of upholding the 50/50 arrangement. The dissent references Justin's communication with Rachael, an emergency motion to suspend parenting time, and his filing of a DCFS complaint against Rachael. The GAL discussed these same items but

17

found that Justin's consistency as C.V.'s primary caretaker outweighed this consideration. We agree with the GAL. Though the circuit court is not bound by the GAL's recommendation, "[a] GAL is the 'eyes and ears' of the court." *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 415 (1994). Regardless, the factor emphasized by the dissent is only 1 of 17 factors that the court is to consider in allocating parenting time. *Supra* ¶ 44.

¶ 52 Nonetheless, shifting a child between households is detrimental as children need a home base. *Swanson*, 275 Ill. App. 3d at 524. A 50/50 arrangement is not a substitute for making a difficult choice between two good parents, especially where such an arrangement may add to the child's insecurity, which is frequently experienced by children of divorce. *Id*. In *Swanson*, the court found that, even though the circuit court could reasonably conclude that the parties were model parents to their children, they failed to demonstrate an ability to cooperate with each other to the degree required for a 50/50 arrangement. *Id.* at 525. Additionally, the court noted that the schedule shifting the children from one house to another twice a month was not in their best interest. *Id.* Thus, the court reversed the circuit court's order and remanded with directions for the court to place the children with one parent subject to liberal visitation by the other. *Id.* We find a similar result is warranted with the parenting time order here.

¶ 53 We reverse the court's parenting time order as it pertains to "regular parenting time" and remand the matter for the court to provide Justin with the majority of parenting time as the record established that he is C.V.'s primary caretaker and provided C.V. with the necessary structure and routine for his needs. The schedule must reflect C.V.'s need for consistency with his sleep, school, and counseling schedules while being mindful that switching a child between households is detrimental, and C.V. needs a home base. We note that the court ordered other schedules and procedures relating to holidays, spring break, summer, the parties' communication method, etc.

18

that are not contested on appeal and not part of our judgment.

¶ 54                          B. Indirect Civil Contempt

¶ 55        Next, Justin challenges the court's order of indirect civil contempt. However, we must first address our jurisdiction. Rachael argues that this court does not have jurisdiction over the contempt order because it is nonfinal as it failed to determine whether Justin was to repay any related costs to Rachael or pay attorney fees for the contempt petition.

¶ 56        Rachael points to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016) pertaining to appeals from final judgments that do not dispose of an entire proceeding and do not require a special finding. This rule provides such "[a]n order finding a person *** in contempt of court which imposes a monetary or other penalty" is an interlocutory appeal without a special finding. Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016). She argues that, because the contempt order failed to impose a penalty (an amount for repayment of costs and attorney fees), it is incomplete and not appealable.

¶ 57        It is true that "[a] contempt order that does not impose sanctions is not final and not reviewable." *In re Estate of Hayden*, 361 Ill. App. 3d 1021, 1026 (2005). However, we find that the contempt order was appealed following the resolution of Justin's motion for modified parenting time, and the resolution of Justin's motion was final and appealable as it disposed of the merits of the underlying litigation. See *In re A.M.*, 2020 IL App (4th) 190645, ¶ 23 (the appellate court had jurisdiction over a contempt order even though it failed to provide a sanction because it was appealed following the court's final order relating to parenting time); Ill. S. Ct. R. 303(a) (eff. July 1, 2017). Though the circuit court in this case stated that there would have to be future hearings regarding any costs and attorney fees, when it later asked the parties about any pending matters for hearing, Rachael did not raise the issue of costs and fees. Additionally, during the hearing on

19

the contempt petition, Rachael and Justin both provided that they were unaware of any expenses that incurred due to a lapse in coverage. Thereafter, Justin raised the issue of the GAL's fees, the court went on to resolve the GAL's fees, and the record shows that there are no pending matters before the court. Thus, we have jurisdiction over the court's contempt order.

¶ 58 Civil contempt occurs when a party fails to do something ordered by the circuit court, resulting in the loss of a benefit or advantage to the opposing party. *In re Marriage of Tatham*, 293 Ill. App. 3d 471, 479 (1997). If the contempt occurs outside the presence of the court, it is indirect. *Id.* at 480. A finding of indirect civil contempt is a question of fact for the circuit court, which will not be disturbed on review unless it is against the manifest weight of the evidence or an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984).

¶ 59 Justin argues that the court overstepped its authority when it provided a purge for reimbursement (1) that never existed as an order between the parties and (2) with the purpose to coerce him to comply with the insurance requirement when he had insurance at the time of the hearing. We find that the contempt order is flawed because it was founded on insufficient evidence.

¶ 60 Rachael, as the petitioner, had the burden to show that a court order had been violated by a preponderance of the evidence. *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Once Rachael demonstrated that Justin violated a court order, the burden would shift to Justin to show that his noncompliance was not willful and that he had a valid excuse for failing to comply. *Id.* at 107-08. Here, it is undisputed and clear from the record that a court order existed, namely the dissolution judgment, that required Justin to maintain health insurance for C.V. However, there is no evidence of record, other than Rachael's mere allegation, that Justin violated that order.

¶ 61 Nonetheless, Rachael argues that a finding of contempt was proper because Justin admitted to the court that there might had been a lapse in coverage due to switching carriers. Although Justin

20

stated on the record that there *might have been* a lapse in coverage, he was unsure because he switched carriers. This unassertive statement does not rise to the level of preponderance of the evidence. More importantly,Rachael's attempt to shift the burden to Justin to prove that he did not have any lapses in insurance coverage is unavailing. Such burden shifting is impermissible as she must first establish that he did not provide health insurance coverage by a preponderance of the evidence. Rachael failed to attach any supporting documentation to her contempt petition and fails to cite any such supporting evidence of a lapse in her brief on appeal. See *Engle v. Foley & Lardner, LLP*, 393 Ill. App. 3d 838, 854 (2009) (the appellate court is not simply a depository in which parties may dump their arguments without factual foundation in hopes that the court will sift through the voluminous record to support their position). Therefore, Rachael failed to meet her burden to support a finding of indirect civil contempt, and we vacate the court's contempt order.

¶ 62                                    III. CONCLUSION

¶ 63        The judgment of the circuit court of Will County is reversed in part, vacated in part, and remanded with directions.

¶ 64        Reversed in part and vacated in part; cause remanded with directions.

¶ 65        JUSTICE LYTTON, concurring in part and dissenting in part:

¶ 66        While I concur with the majority's ruling on the indirect civil contempt issue, I dissent from the majority's ruling on parenting time. I would find the trial court's award of equal parenting time to Justin and Rachael was not an abuse of discretion or against the manifest weight of the evidence.

¶ 67        The trial court has broad discretion in fashioning a custody decree in the best interests of a child. *In re Marriage of Perez*, 2015 IL App (3d) 140876, ¶ 24. In custody cases, a strong presumption favors the result reached by the trial court because of its superior opportunity to

observe and evaluate witnesses when determining the best interests of the child. *Shinall v. Carter*, 2012 IL App (3d) 110302, ¶ 30. A reviewing court will not reverse a trial court's custody determination unless it is against the manifest weight of the evidence or constitutes an abuse of discretion. *Id.*

¶ 68 Custody awards that grant each parent equal parenting time by alternating custody between parents for extended periods are generally inappropriate. See *In re Marriage of Swanson*, 275 Ill. App. 3d 519, 524 (1995) (reversing custody order giving mother custody of children first half of each month and father custody last 14 days of each month); *In re Marriage of Oros*, 256 Ill. App. 3d 167, 170 (1994) (custody order rotating child every three months between parents' residences in different cities was abuse of discretion); *In re Marriage of Hacker*, 239 Ill. App. 3d 658, 661 (1992) (custody order requiring children to live with one parent one week and another the next week was error); *Davis v. Davis*, 63 Ill. App. 3d 465, 470 (1978) (custody order shifting child between parents every four months constituted abuse of discretion). Such arrangements are "usually employed to appease the selfish desires of the parties" but are rarely in the best interests of children. *Davis*, 63 Ill. App. 3d at 470.

¶ 69 However, such an arrangement can be in the best interests of a child where the parents live close to each other and such a schedule is necessary to thwart alienation caused by one parent. See *In re Marriage of Divelbiss*, 308 Ill. App. 3d 198, 210 (1999) (affirming custody award that granted father custody of 15-year-old five months out of the year). Equal parenting time enables the child "to foster and maintain a close and continuing relationship with both parents." *Id.*

¶ 70 Additionally, a custody award that provides equal parenting time by alternating custody between parents every few days may be in the best interests of a young child. See *Perez*, 2015 IL App (3d) 140876, ¶¶ 29-33. Such an arrangement is proper when it is not created "in an attempt to

22

equalize parenting time between the parties" but to "maximize the involvement of both parties." *Id.* ¶ 32. An award of equal parenting time is particularly appropriate where (1) both parents are fit and capable; (2) the parents are cooperative and can reach shared decisions together in the best interests of the child; (3) the parents live in close proximity to each other so as not disrupt the child's schooling, connections, and community ties; (4) the schedule accounts for the parents' work schedules; (5) there is no indication the child will suffer psychologically or emotionally under the shared parenting schedule; and (6) neither parent's residence is unsuitable for the child. See *id.* ¶ 33.

¶ 71        The majority improperly focuses on Justin and Rachael's inability to cooperate as the basis for reversal. This is problematic for several reasons. First, the majority's reliance on cooperation is misplaced because this case involves equal parenting time, not joint custody. Parental cooperation is of paramount importance in joint custody determinations. See *In re Marriage of Drummond*, 156 Ill. App. 3d 672, 679-80 (1987). However, in allocating parenting time, "the ability of parents to cooperate" is just one of many factors a court must consider. See 750 ILCS 5/602.7(b)(9) (West 2018).

¶ 72        Here, the trial court did not grant the parties joint custody of C.V. Therefore, cases addressing joint custody are irrelevant. Nevertheless, every case cited by the majority involved an award of joint custody. See *Drummond*, 156 Ill. App. 3d 672; *In re Marriage of Bush*, 191 Ill. App. 3d 249 (1989); *Swanson*, 275 Ill. App. 3d 519; *Hacker*, 239 Ill. App. 3d 658; *Perez*, 2015 IL App (3d) 140876.

¶ 73        The majority cites three cases for the following proposition: "In cases where the evidence clearly showed that parents had too much animosity to be able to cooperate, 50/50 arrangements have been set aside." *Supra* ¶ 47. However, two out of three cases cited by the majority did not

23

involve 50/50 arrangements. See *Drummond*, 156 Ill. App. 3d at 681 (one parent had custody of the children nine months out of the year while the other parent had custody of the child only during summer, Christmas, and spring break); *Bush*, 191 Ill. App. 3d at 263-64 (mother had primary custody of child for 10 months out of the year, with weekend visitation by the father; father had primary custody of child for 2 months out of each year with no visitation by mother).

¶ 74    Only one of the cases cited by the majority involved a 50/50 parenting arrangement. See *Swanson*, 275 Ill. App. 3d 519. However, *Swanson* is distinguishable from this case because the 50/50 split in *Swanson* required the children to spend two-week intervals with each parent, and the trial court found that "shifting the children from one house to another twice a month is not in their best interests." (Emphasis omitted.) *Id.* at 524. Here, where C.V. will alternate between his parents' houses every few days, such an arrangement is in his best interests because it maximizes the involvement of both parents in his life. See *Perez*, 2015 IL App (3d) 140876, ¶ 32.

¶ 75    Moreover, cooperation does not require that parties never have disputes or that they agree on all aspects of parenting. See *In re Tate Oliver B.*, 2016 IL App (2d) 151136, ¶ 19 (affirming joint custody despite disagreements between parties and mother's claim of "an inability to communicate" where evidence showed parents "worked together to resolve problems that arose with visitation, child care, and other issues"); *In re Marriage of Seitzinger*, 333 Ill. App. 3d 103, 108-10 (2002) (affirming joint custody despite parties' disagreements over day care, preschool, and religious upbringing where they agreed on other issues, such as counseling for the child, and neither disputed that the other was not a good parent); *Hacker*, 239 Ill. App. 3d at 661 (affirming joint custody where both parties were reasonably loving and capable parents who were sufficiently able to cooperate even though each parent attempted to prove the other less capable); *In re Marriage of Marcello*, 247 Ill. App. 3d 304, 310-11 (1993) (affirming joint custody award despite

mother's objection and complaints about father where father was actively involved in child's activities, mother testified father should not be excluded from major decisions, and parents lived in close geographical proximity).

¶ 76 Here, the trial court heard extensive testimony from both parents as well as the GAL regarding the parties' ability to parent and their relationship with each other and their child. The evidence showed that both Justin and Rachael are fit and capable parents with suitable homes for C.V., which are within minutes of each other. While there have been disagreements and disputes between Rachael and Justin, they have been able to cooperate to make decisions in the best interests of C.V., including obtaining a new counselor for him. Additionally, neither party claimed that the other was not a good parent. Based on the evidence presented, I would find the parties have shown sufficient cooperation to equally share parenting time of C.V.

¶ 77 Finally, in focusing entirely on the parties' alleged inability to cooperate, the majority ignored other relevant factors the trial court properly considered in allocating parenting time. One such factor is "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." 750 ILCS 5/602.7(b)(13) (West 2018). The trial court considered many exhibits, including written communications between the parties. According to the GAL, there was "unnecessarily aggressive, harassing communication" between the parties, but "an overwhelming majority of the time" that type of communication came from Justin. Justin did not dispute that he sent approximately 300 harassing, threatening, or demeaning written comments to Rachael.

¶ 78 The trial court also considered documents the parties filed and the testimony they provided. In his motion for change in parenting time, Justin sought to increase his parenting time and decrease Rachael's time parenting time with C.V., asserting that it was not in C.V.'s best interest

25

to spend time with Rachael. Justin also filed an emergency motion to suspend all of Rachael's parenting time with C.V. and provided a copy of that motion to the counselor and principal at C.V.'s school. Finally, Justin filed a complaint against Rachael with DCFS on at least one occasion. Rachael, on the other hand, testified that she had no problem with C.V. spending time with Justin. No evidence was presented that she disparaged Justin to C.V. or any other person.

¶ 79    The evidence set forth above shows a pattern of disparagement of Rachael by Justin to third parties, including the court, school personnel and DCFS. The trial court observed Justin's behavior toward Rachael firsthand and made the following comments to him:

"This is not a game that you get to win because what you really believe is you are the better parent. There is no question in my mind that that's exactly what you believe and you need to demonstrate it on a regular basis. The problem is that what you're doing is demonstrating that onto C[.V.]'s mind, and if you don't think that makes him feel like crap, you know nothing about kids because that's what you keep doing, and that I'm not sure that there is any allocation judgment in place that can stop that. Only you can stop that.

Again I don't know what you win by that. So you're more dialed in on  C[.V]. You're more focused on C[.V.]. You're the better parent on C[.V.] and she's an idiot and she's stupid and she doesn't know this and she needs a DCFS investigation and she needs to be put in her place. I see no way that that behavior ever becomes productive."

¶ 80    The record also supports the conclusion that Justin made disparaging comments about Rachael to C.V. As the majority notes, C.V. "struggled with the conflict between his parents." *Supra* ¶ 51. Based on the testimony of the GAL and the observations of the court, Justin is the

26

primary source of the parties' conflict. Nevertheless, the majority completely ignored this factor in its discussion of C.V.'s best interests.

¶ 81     The trial court determined that based on all the evidence presented, it was in the best interests of C.V. for the parties to continue to share equal parenting time. The record establishes that the trial court considered all the evidence presented in rendering its judgment, and it is not our function to reweigh the evidence or assess the credibility of testimony. *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). Nor can we "set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *Id.* Based on the record, I would find the court's allocation of parenting time was not against the manifest weight of the evidence or an abuse of discretion.

**No. 3-19-0650**

| | |
|---|---|
| **Cite as:** | *In re Marriage of Virgin*, 2021 IL App (3d) 190650 |
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 15-D-340; the Hon. Elizabeth Hoskins Dow, Judge, presiding. |
| **Attorneys for Appellant:** | David Gotzh, of Hobart, Indiana, for appellant. |
| **Attorneys for Appellee:** | Ethan D. Chouinard, of Meents Law, P.C., of Channahon, for appellee. |