2021 IL App (2d) 210168-U
No. 2-21-0168
Order filed August 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF HAROLD C. LEMKE, III, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) | No. 17-D-1501 |
| | ) | |
| KAYLIE L. LEMKE, | ) ) | Honorable David Christopher Lombardo, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:    An order denying a mother's petition for joint decision-making authority regarding her son's medical care was not against the manifest weight of the evidence. Orders granting the mother additional parenting time, though not as much as she requested, likewise were not against the manifest weight of the evidence.

¶ 2    Following a trial in 2015, a judge of the circuit court of McHenry County dissolved the marriage of Harold (Hal) and Kaylie Lemke. Hal received sole custody of the parties' minor son, C.L. (born in 2012), subject to Kaylie's parenting time. Kaylie appealed. In relevant portion, we held that the award of sole custody to Hal was not against the manifest weight of the evidence. *In re Marriage of Lemke*, 2016 IL App (2d) 160264-U, ¶ 30.

¶ 3    In August 2017, Kaylie registered the judgment for dissolution of marriage (JDOM) in Lake County. Kaylie then petitioned for a modification of parenting time and for joint decision-making authority regarding C.L.'s medical care. Following an evidentiary hearing, the court granted Kaylie additional parenting time, though not as much as she requested. The court denied Kaylie's petition for joint decision-making authority regarding C.L.'s medical care. Kaylie appeals these orders. We affirm.

¶ 4                                   I. BACKGROUND

¶ 5                                   1. *The JDOM*

¶ 6    When the JDOM was entered, Hal resided in Richmond and Kaylie resided in Arlington Heights. In the JDOM, the court allocated Hal parenting time as follows:

- Alternate weekends

- Two summer vacation weeks each year

- Designated holidays

- Upon C.L. commencing kindergarten, spring break during odd years

- The first half of Christmas break from school during even years and the second half during odd years, subject to Kaylie's Christmas holiday time

- All other times when Kaylie did not have parenting time

The court allocated Kaylie parenting time as follows:

- Until C.L. commenced kindergarten, alternate weekends from Friday at 4 p.m. to Monday at 4:30 p.m.

- Upon C.L. commencing kindergarten, alternate weekends from Friday at 4 p.m. to Sunday at 6:30 p.m.

- Upon C.L. commencing kindergarten, one evening per week from 4 p.m. to 7 p.m., the

exact evening to be determined by the parties

• Designated holidays

• Upon C.L. commencing kindergarten, spring break during even years

• The first half of Christmas break from school during odd years and the second half during even years, subject to Hal's Christmas holiday time

¶ 7 In ruling on Kaylie's postjudgment motion following the 2015 trial, the court allocated Kaylie two additional weeks of summer vacation with C.L. each year. The court also modified Kaylie's regular parenting time "so as to be consistent with the parenting time she has been allotted under the temporary parenting time order that has been in place." The record in the present appeal does not contain all the orders entered in McHenry County prior to the JDOM. From what we can tell from the record, the effect of this modification was that, until C.L. started kindergarten, Kaylie's parenting time on alternate weekends would begin at 3:30 p.m. on Thursdays, not 4 p.m. on Fridays.

¶ 8 2. *Kaylie's Petitions in Lake County and the Evidentiary Hearing*

¶ 9 After the JDOM was entered, the parties relocated to separate residences in Grayslake near each other. Kaylie subsequently filed multiple petitions, which included requests for joint decision-making authority regarding C.L.'s medical care and a modification of parenting time. On October 24, 2018, before these matters proceeded to a hearing, the court entered an agreed order establishing a modified parenting schedule for holidays.

¶ 10 The court held a nine-day evidentiary hearing on Kaylie's petitions over many months in 2020. It would be impractical and unnecessary to recount all the evidence that the parties presented. It will suffice to relate the following.

¶ 11 Since the JDOM was entered, the greatest source of conflict between the parties centered

around C.L.'s medical care. The evidence showed that C.L. exhibited significant behavioral problems at school, which continued until he was diagnosed with attention deficit hyperactivity disorder (ADHD) and received medication. By all accounts, C.L.'s behavior had improved by the time of the evidentiary hearing. Much of the hearing consisted of Hal and Kaylie blaming each other for C.L.'s struggles. Generally, Hal believed that Kaylie did not implement the parenting techniques that were recommended by C.L.'s medical team. From Hal's perspective, Kaylie also violated the JDOM by scheduling medical appointments and requesting referrals to specialists. Hal further testified that Kaylie routinely misrepresented facts to both medical professionals and school personnel. Kaylie, on the other hand, felt that Hal should have taken steps to ensure that C.L. was evaluated sooner and more extensively. Kaylie also complained that Hal did not give her complete information about C.L.'s medical treatment and the behavioral reports from school.

¶ 12    The record is replete with other examples of the parties disagreeing as to how to manage C.L.'s medical needs. This included disagreement as to how to proceed in light of C.L.'s diagnosis of a "provisional tic disorder." The parties also disagreed whether Hal acted appropriately by having a surgeon correct a condition with C.L.'s thumb.

¶ 13    The parties voiced many other complaints about each other. For example, Hal testified that Kaylie made inappropriate comments about the litigation in C.L.'s presence. Among Kaylie's concerns were that she was not receiving enough phone time with C.L. and that she was listed behind Hal's parents on the list of emergency contacts for C.L.'s school registration. Generally, when one party made an allegation, the other party denied it or cast the circumstances in an entirely different light.

¶ 14    Aside from their disagreements over C.L.'s medical care and their numerous grievances about one another, the evidence showed that Hal and Kaylie were able to participate jointly and

civilly in connection with some special events and C.L.'s extracurricular activities. For example, they attended C.L.'s scouting and sporting events together without incident. As another example, when Kaylie went on vacation with C.L., Hal drove them to the airport and watched Kaylie's dog.

¶ 15    By agreement, the parties admitted into evidence a report dated March 19, 2019, authored by Kara Anast, a licensed clinical psychologist. Anast served as an evaluator pursuant to section 604.10(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10(c) (West 2018)). Anast determined that, "[w]hile both parties would like to blame the other for the conflict, they both contribute to this conflict to a significant degree." Nevertheless, Anast had "more concerns about Kaylie's parenting than Hal's." Among the concerns was "Kaylie's ability at being consistent with [C.L.] and with setting limits," as "[c]hildren with [ADHD] typically thrive more with structure and positive limits setting."

¶ 16    Anast opined that Hal should retain sole decision-making authority over C.L.'s medical care, subject to several specific recommendations pertaining to issues such as continuity of care and the exchange of information between the parties. Among the bases for Anast's opinion were: (1) the level of conflict between the parties would likely cause joint decision-making to be harmful to C.L., (2) both parents were "unable to keep their disputes/conflict away" from C.L., and (3) the professionals involved in C.L.'s care have stated that C.L. received an appropriate level of care while Hal had sole decision-making authority.

¶ 17    With respect to the issue of parenting time, Anast did not believe that the present schedule was in C.L.'s best interests, as C.L. was going "long periods of time without seeing his mother." After ruling out various options, including a 50/50 parenting time schedule, Anast opined that it was in C.L.'s best interests to "reside primarily with his father and spend more time with his mother than is currently the case." Anast recommended the following parenting schedule for Kaylie:

(1) every other weekend from Friday after school until Monday at the start of school, (2) the Thursday after Kaylie's weekend from after school until 7 p.m., and (3) the Monday after Hal's weekend from after school until 7 p.m. Anast proposed that, after Kaylie completed a parenting class and consistently got C.L. to school on time on Monday mornings for three months, her Thursday parenting time could become an overnight.

¶ 18    Sylvia Foggetti, an attorney, testified as the guardian *ad litem* (GAL). Her report and testimony generally were far more favorable to Hal than Kaylie. Foggetti recommended no changes in parenting time and that Hal should retain sole decision-making authority regarding C.L.'s medical care.

¶ 19                      3. *The Court's Resolution of Kaylie's Petitions*

¶ 20    On January 22, 2021, the court granted, in part, Kaylie's petition to modify parenting time. The court denied her petition for joint-decision making authority regarding C.L.'s medical care.

¶ 21    In so ruling, the court determined that there had been a substantial change of circumstances since the JDOM was entered because (1) the parties now resided within walking distance of each other, (2) C.L. was exhibiting behavioral improvements, and (3) C.L. was 6 years older now. The court found that Hal and Kaylie cooperated in planning activities and attended events together for C.L.'s benefit, which showed an improved ability to put C.L.'s interests first. Nevertheless, the court added that "the parties must continue to do better in this area" to promote consistency for C.L. According to the court, the parties were "well capable of cooperating," and it was in C.L.'s best interests to have more time with Kaylie than provided for in the JDOM.

¶ 22    The court ordered the following new schedule for Kaylie's parenting time:

> • Every other weekend from Friday at 3 p.m. or after school until Monday at 8 a.m. or the start of school (this matched Kaylie's request)

• Each Tuesday at 3 p.m. or after school until Wednesday at 8 a.m. or the start of school (Kaylie had requested (1) the Monday following Hal's weekend at 3 p.m. or after school until Wednesday at 8 a.m. or the start of school and (2) the Wednesday before Hal's weekend at 3 p.m. or after school until Friday at 8 a.m. or the start of school)

• All other times as agreed by the parties (this matched Kaylie's request)

• Holidays, as set forth in the parties' agreed order of October 24, 2018 (this matched Kaylie's request)

¶ 23    In denying Kaylie's request for joint decision-making authority regarding C.L.'s medical care, the court reasoned as follows:

"The evidence strongly supports awarding Hal sole decision making for medical issues[,] as the conflict between the parties has continued since the initial decision in Hal's favor. The Court finds Kaylie has interfered in Hal's decisions to the detriment of [C.L.], her vigorous pursuit of what she believes has clouded her overall judgment resulting in various violations of the allocation judgment. While it also appears an avoidable lack of communication between the parties played a part in the conflict over medical decision making, it remains clear that to ensure prompt and measured decision making, Hal should continue to exercise sole responsibility in this area."

The court, however, required Hal to "consult with Kaylie regarding any extraordinary medical decisions" and to "consider her opinion before deciding on a course of care." Hal also must notify Kaylie of C.L.'s medical appointments. The court prohibited Kaylie from interfering with C.L.'s medical appointments and setting appointments without Hal's written consent. The court gave both parties the right to "request, review and discuss the minor child's health and medical records with the child's providers prior to treatment." Except in cases of emergency, both Hal and Kaylie also

have the right to timely seek a second opinion before C.L. receives treatment for any extraordinary medical procedure. If any medical provider refuses to tender information or records to either parent, the other parent must tender such information or records.

¶ 24    Both parties moved to clarify and reconsider the January 22, 2021, order. One of the points that Kaylie raised in her motion was that the court erroneously failed to address a summer parenting schedule.

¶ 25    On March 3, 2021, during the hearing on the parties' postjudgment motions, the court explained that it inadvertently failed to rule on the issue of summer parenting. The court invited the parties to brief the issue of summer parenting time schedules using the testimony adduced at the prior evidentiary hearing. The court also mentioned that the parties could petition to modify the summer schedule.

¶ 26    On March 4, 2021, the court issued its written order ruling on the parties' postjudgment motions. The court clarified the judgment in certain respects to set pick up and drop off times on school days. The court also clarified that Kaylie could attend all of C.L.'s medical appointments but that she "shall not interfere" with them. The court modified the judgment to grant Kaylie additional parenting time on alternating Thursdays (the day before Hal's weekends with C.L.) from 15 minutes following the end of the school day (or 4 p.m. if school is not in session) until 7 p.m.

¶ 27    On March 15, 2021, Kaylie filed a petition requesting parenting time on non-school days during the school year and equal parenting time during the summers.

¶ 28    On March 30, 2021, Kaylie filed a notice of appeal, specifying her intent to challenge the January 22 and March 4, 2021, orders. On April 1, 2021, Hal filed a notice of cross-appeal from the March 4 order.

¶ 29    On June 9, 2021, the court granted Kaylie's March 15 petition in part without taking

additional evidence. The court ruled as follows:

"Commencing in the summer of 2021 and for each summer hereafter, KAYLIE's parenting time with C.L. is increased to include that her alternating long weekend will begin on Thursday at 3:00 p.m. through Monday at 8:00 a.m. KAYLIE will continue to have every Tuesday at 3:00 p.m. until Wednesday at 8:00 a.m. and the Thursday before HAL's long weekend from 4:00 p.m. until 7:00 p.m. for dinner."

The court also ordered that the parties would split the non-school days during the school year.

¶ 30    During the briefing of this appeal, we allowed the parties to file amended notices of appeal to encompass the trial court's June 9, 2021, order. Both parties filed amended notices of appeal. Hal subsequently voluntarily dismissed his entire cross-appeal.

¶ 31    Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), our disposition was due on August 27, 2021. There is good cause for failing to meet that deadline here, as we extended the briefing schedule to allow the parties to amend their notices of appeal to include the June 9, 2021, order. Doing so avoided the likelihood of a separate appeal involving the same evidence.

¶ 32                                II. ANALYSIS

¶ 33    Kaylie contends that the court erred by denying her request for joint decision-making authority regarding C.L.'s medical care and denying her requests for equal parenting time during both the school year and the summer. Hal responds that the court's determinations in these respects were not against the manifest weight of the evidence.

¶ 34    Pursuant to section 610.5(c) of the Act:

"[T]he court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation

judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2018).

Here, the trial court determined that circumstances substantially changed since the entry of the JDOM, and that finding is not at issue on appeal.

¶ 35    One of the "significant decision-making responsibilities" identified in the Act involves the child's "[h]ealth, including all decisions relating to the medical, dental, and psychological needs of the child and to the treatments arising or resulting from those needs." 750 ILCS 5/602.5(b)(2) (West 2018). In allocating significant decision-making responsibilities, the Act directs a court to consider the following factors:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the

child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2018).

¶ 36     Section 602.7(b) of the Act directs a court to consider similar factors when allocating parenting time:

(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and

with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.7(b)

(West 2018).

¶ 37　We will not disturb a trial court's determinations regarding decision-making authority or parenting time unless the judgment is against the manifest weight of the evidence. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45 (parenting time); *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 (decision-making authority). We review the evidence "in the light most favorable to the appellee." *In re Marriage of Debra N. & Michael S.*, 2013 IL App (1st) 122145, ¶ 45. Our standard of review is deferential and reflects the reality that the trial court "is in the best position to assess the credibility of witnesses and to determine the child's best interest." *Virgin*, 2021 IL App (3d) 190650, ¶ 45.

¶ 38　We hold that the trial court's determination that it was in C.L.'s best interests to deny Kaylie's request for joint decision-making authority regarding medical matters was not against the manifest weight of the evidence. The evidence showed that the parties were able to act civilly toward one another in certain contexts, such as participating in C.L.'s extracurricular activities. When it came to C.L.'s medical care, however, the parties were unable to cooperate or communicate effectively. The parties routinely disagreed about which medical professionals C.L. should see and which treatments/assessments were appropriate. More significantly, they were unable to work through those issues without a high degree of conflict and even court intervention. C.L.'s school staff and medical providers frequently heard one thing from Hal and something completely different from Kaylie. This created a pattern of confusion and miscommunication.

¶ 39　The evidence also supported the court's conclusion that Kaylie interfered with Hal's sole decision-making authority over medical matters pursuant to the JDOM. For example, there was evidence that Kaylie took C.L. to a "play therapist" without Hal's agreement and that she requested referrals directly from C.L.'s doctors in relation to matters as to which the parties disagreed. These

issues became one of the primary sources of acrimony between the parties. There was evidence that the parties had difficulty coordinating even simple matters, such as agreeing when C.L. would get his medications.

¶ 40    Nevertheless, in challenging the judgment, Kaylie claims that Hal testified that he was "amenable to Kaylie jointly making medical decisions for [C.L.]." Hal's testimony cannot be fairly construed in the manner that Kaylie suggests. Hal testified that he would be amendable to consulting Kaylie if he wanted to change C.L.'s doctors. Hal also said that, "[w]ithin reason," it was important for them to make decisions together and "to have a conversation about it and try to come to everything mutually." He further testified that he would "consider" Kaylie's opinions if, hypothetically, a doctor recommended surgery for C.L. and Kaylie thought that the condition could be treated by less intrusive means. Contrary to what Kaylie suggests, however, Hal never said that he was amenable to allowing Kaylie to have joint decision-making authority over C.L.'s medical care.

¶ 41    As she did below, Kaylie portrays Hal as inattentive or even neglectful when it comes to C.L.'s medical needs. She credits herself for C.L.'s recent behavioral improvements, given her persistent advocacy for C.L. to be evaluated. In her reply brief, Kaylie proposes that C.L.'s "behavior would have improved much sooner if Kaylie had joint decision-making that allowed her to schedule an evaluation herself." With this argument, Kaylie essentially admits that she wants joint decision-making authority not because she and Hal can agree on medical matters or resolve their disagreements civilly but because she wants to schedule appointments for C.L. without Hal's consent. Moreover, the evidence supported a conclusion that Hal diligently attended to C.L.'s medical needs and followed the recommendations of medical professionals. On that point, we note that the 604.10(c) evaluator indicated in her report that "the professionals involved have stated that

[C.L.] has received the appropriate level of care." The GAL similarly indicated in her report that C.L.'s psychiatrist said that Hal did not wait too long to get C.L. evaluated for ADHD.

¶ 42    Kaylie further outlines what she considers to be Hal's attempts to "alienate" her from C.L.'s doctors. Aside from the fact that Hal points the finger back at Kaylie by arguing that she interfered with C.L.'s medical treatment, Kaylie's argument merely underscores that the parties are incapable of cooperating to the extent that would be required to jointly manage decisions regarding C.L.'s medical care.

¶ 43    Kaylie and Hal obviously both love their son very much, but they have very different approaches to managing his medical care. Under these circumstances, the evidence supported the trial court's decision to retain Hal's sole decision-making authority over C.L.'s medical care.

¶ 44    The evidence also supported the court's allocation of parenting time both during the school year and over the summers. In modifying the allocation of parenting time, the court gave Kaylie more parenting time than she had under the JDOM but less time than she requested. The court reasonably determined that Kaylie's request for equal parenting time was not in C.L.'s best interests. "[C]ourts have traditionally viewed 50/50 joint parenting time with caution," especially where the parties have "too much animosity to be able to cooperate." *Virgin*, 2021 IL App (3d) 190650, ¶ 47. Although the record contains some examples of the parties cooperating, there were many instances where their interactions were marked by animosity.

¶ 45    Additionally, the evidence showed that the parties had different parenting styles, with Hal tending to be more regimented than Kaylie and better able to control C.L.'s misbehavior. The GAL, for example, testified that C.L. was "a different child" with Hal than he was with Kaylie. C.L. had a history of significant behavioral problems, which eventually improved with medication. Although Kaylie presented a different perspective through her testimony, one reasonably could

conclude from the totality of the evidence that C.L. benefitted, and would continue to benefit, from the consistency and stability that Hal offered. Neither the 604.10(c) evaluator nor the GAL believed that it was in C.L.'s best interests to equalize the parenting time between Kaylie and Hal.

¶ 46    Among the points that Kaylie raises in challenging the judgment is that she "has shown an exemplary ability to facilitate a relationship between Hal and C.L." The trial court heard conflicting evidence on that point. For example, although Kaylie testified that she facilitated the relationship, Hal recounted inappropriate comments that Kaylie made about him in C.L.'s presence. Kaylie also mentions in her brief that C.L. wanted equal parenting time. On that point, the record gives rise to suspicions that Kaylie inappropriately discussed the litigation with C.L. For example, the GAL found it "unusual" for a child who was seven years old at the time to talk about "equal parenting time."

¶ 47    Kaylie further notes that she had increased parenting time during the summers of 2018, 2019, and 2020 without any "adverse effects" on C.L. She also notes that she gets C.L. to school on time whenever she has overnight parenting time. These facts do not justify overturning the judgment. The trial court's task in allocating parenting time was to ascertain C.L.'s best interests, not necessarily to award Kaylie as much parenting time as possible without adversely affecting C.L. Furthermore, there is no doubt that Kaylie loves C.L. and that she can provide for his needs, such as by getting him to school on time. But when two loving and capable parents divorce, it is not always in a child's best interests to divide time equally between the parents' homes. See *Virgin*, 2021 IL App (3d) 190650, ¶ 52 ("[S]hifting a child between households is detrimental as children need a home base. [Citation.] A 50/50 arrangement is not a substitute for making a difficult choice between two good parents, especially where such an arrangement may add to the child's insecurity, which is frequently experienced by children of divorce."). Here, the evidence showed that the

parties' contentious relationship is a barrier to equal parenting time. The evidence also showed that C.L., perhaps more than other children, requires stability to manage his behavior. Fortunately, C.L. presently is experiencing success after several difficult years. The trial court correctly recognized the need to facilitate Kaylie's relationship with C.L. without sacrificing C.L.'s stability. Accordingly, the court's decision to allocate less than equal parenting time to Kaylie, while still giving her more time than she had under the JDOM, was not against the manifest weight of the evidence.

¶ 48                                 III. CONCLUSION

¶ 49     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 50     Affirmed.