**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 240003-U

Order filed May 31, 2024

---

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| *In re* PARENTAGE OF A.G., a Minor. | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| (STEPHEN GUZMAN, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner and Counterrespondent-Appellee, | ) | Appeal No. 3-24-0003 |
| | ) | Circuit No. 20-F-16 |
| | ) | |
| v. | ) | |
| | ) | |
| BREANNE SELIN, | ) | Honorable |
| | ) | Richard D. Felice, |
| Respondent and Counterpetitioner-Appellant). | ) | Maureen R. Riordan, |
| | ) | Judges, Presiding. |

---

JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Albrecht concurred in the judgment.

---

**ORDER**

¶ 1     *Held*:  The trial court's award of joint decision-making responsibility for the minor child and 50/50 parenting time was not against the manifest weight of the evidence. We lack jurisdiction to consider the mother's remaining claims on appeal. Affirmed.

¶ 2     Respondent-counterpetitioner, Breanne Selin, appeals from the trial court's judgment, *inter alia*, awarding her and petitioner-counterrespondent, Stephen Guzman, joint decision-making and equal parenting time with their minor child, A.G. For the reasons set forth below, we

affirm the trial court's judgment with respect to allocation of parental responsibilities but do not reach Breanne's remaining claims for lack of jurisdiction.

¶ 3                                    I. BACKGROUND

¶ 4        A.G. was born to the parties in December 2017. It was undisputed that Stephen was A.G.'s biological father. We recount in relevant part the procedural history, guardian *ad litem*'s recommendation, trial proceedings, trial court's judgment, and posttrial proceedings.

¶ 5                                  A. Procedural History

¶ 6        On January 9, 2020, Stephen filed a petition for allocation of parenting time and parenting responsibilities, seeking reasonable parenting time and joint decision-making regarding A.G.'s major medical, religious, and educational decisions. On March 9, 2020, Breanne filed a counterpetition for allocation of parenting time and parental responsibilities, child support and other relief. She sought decision-making authority in the event of disagreement; that she be designated the primary parent for school and legal purposes and afforded the majority of parenting time on a temporary and permanent basis; and that Stephen be ordered, on a retroactive basis, to pay statutory child support and other child-related expenses and provide medical, dental, and vision insurance for A.G. Breanne also filed a separate motion for temporary and permanent child support and allocation of child-related expenses, requesting, *inter alia*, that Stephen pay temporary and permanent statutory child support and two-thirds of A.G.'s health, extra-curricular, childcare, educational, and other child-related expenses retroactive to the filing date of the motion—March 9, 2020.

¶ 7        In addition to extensive pretrial litigation over discovery and other matters, on September 8, 2020, Breanne filed a motion for a temporary parenting schedule, noting that the parties did not agree on the schedule and requesting that she be awarded the majority of parenting time,

decision-making authority in the event of disagreement, and designation as the primary parent for school and legal purposes. In addition, on August 25, 2021, Stephen filed a "Petition To Maintain Status Quo Parenting Time And For Minor Child To Attend Preschool," stating that: (1) the parties had been exercising a 50/50 parenting time schedule since the inception of the case but that Breanne had "recently decided to not maintain the status quo and refused to drop the minor child at [Stephen's] residence at his scheduled parenting time they have been following for a year in [*sic*] a half, and is denying [Stephen] parenting time," and (2) after the parties toured several preschools, Stephen registered A.G. in preschool, to begin August 25, 2021, and paid the fees but that Breanne refused to drop A.G. at Stephen's home at the scheduled time and refused to allow A.G. to attend preschool on the basis of concerns over COVID. Breanne filed a response in opposition, stating: (1) that an equal parenting schedule was initially in place due to Breanne's weekend work schedule and that Stephen refused to modify the schedule when Breanne obtained a new job without weekend work, and (2) she never agreed to enrollment of A.G. in preschool, outlining concerns regarding A.G.'s exposure to the virus. The trial court ultimately set all pending matters for trial. Also, during the course of trial, on August 18, 2022, Stephen filed a motion to appoint a therapist for A.G., to which Breanne filed a response in opposition.

¶ 8                              B. GAL Recommendation

¶ 9        Meanwhile, the trial court appointed a guardian *ad litem* (GAL) on September 15, 2020. The record reflects extensive litigation over the parties' respective contributions to GAL fees and Breanne's unsuccessful requests to disqualify the GAL. The GAL conducted an investigation and gave an oral report and recommendation to the court on March 12, 2021. The GAL

recommended that Breanne and Stephen have joint parental decision-making responsibility and 50/50 parenting time.

¶ 10        With respect to decision-making responsibility, the GAL discussed the issues identified by statute—education, health, religion, and extracurricular activities. As for A.G.'s education, the GAL noted that, while both parents would like to see A.G. in preschool, they agreed that it was not the right time because of COVID. Breanne's parents cared for A.G. when Breanne was at work, and Stephen's sister cared for A.G. when Stephen was at work. Once A.G. was of school age, the GAL recommended that A.G. be placed in the school district where the Stephen lived because it is halfway between the parents' homes (which are only 10 minutes apart). The GAL also recounted the parties' joint efforts with respect to minor medical issues that A.G. had recently faced, including alternating taking A.G. to doctor visits, reporting to each other after the visits, picking up medication for the other parent, exchanging dietary information for A.G., and providing each other progress notes. In sum, "[t]hey did a very good job at making joint decisions." The GAL further reported that the parties had informed her that they had no particular affiliation with any religions and would support A.G. in choice of religion as A.G. matures and that, while extracurricular activities were not at issue then given A.G.'s age, the GAL did not foresee a problem with respect to joint decision-making on that issue.

¶ 11        In discussing A.G.'s best interests for purposes of allocating significant decision-making responsibilities, the GAL stated that the parents have the ability to cooperate to make decisions and that "[w]hen they are together and they are working through this, their conflict is minimal." In discussing any prior agreement or course of conduct between the parents relating to decision-making with respect to A.G., the GAL stated that, during several Zoom meetings with the parties, "we went through in detail each and every decision-making aspect and they agreed that it

4

should be joint" but that after we have the meetings, "something happens where [Breanne] changes her mind" and "backs out of what she agreed to." While Breanne now wanted ultimate decision-making authority on major issues in the event of the parties' disagreement, the GAL stated that joint decision-making was in A.G.'s best interests.

¶ 12        Addressing her recommendation of 50/50 parenting time, the GAL discussed the home visits that she conducted with both parents and the child-care arrangements in place at the time. In addition, the GAL stated that "the parties have been doing equal parenting time with the current schedule in place since August of 2020." The schedule was "[o]n one week dad has Monday and Tuesday, mom has Wednesday/Thursday, then dad has the weekend. The following week rotates. Mom gets Monday/Tuesday, dad Wednesday/Thursday, and then mom gets the weekend. The problem with this schedule was that dad thought it was too much back and forth. So he wanted one week on/one week off. The mom's issues with it was that she did not want to go that long of a period without seeing [A.G.]" Thus, after a Zoom meeting, the GAL "sent the parties to talk out a schedule on their own." While "Breanne was hesitant with a schedule," after a second Zoom meeting, "she was very committed to a two/two five/five rotation." However, the next time they were in court, Breanne backed out of the agreement. Breanne then wanted a 60/40 division of parenting time but the GAL stated that Breanne never provided a basis, instead simply giving the GAL "a proposed parenting agreement drafted by her attorney which does not do a 60/40 division of time" and gives Stephen "much less time." The GAL expressed concern that Breanne's parents were influencing her and stated that the parties work together and are able to reach agreement on their own. For instance, they reached agreement on extra time with A.G. and they resolved the holiday schedule. In sum, the GAL recommended the continuation of equal parenting time, noting that A.G. benefits from time in both homes.

¶ 13                                    C. Trial

¶ 14            Trial commenced on November 18, 2021, spanned 15 days, and concluded on September

16, 2022. Witnesses included Breanne, Stephen, the GAL, Alexandria Scanlan (Stephen's

girlfriend), and Breanne's mother, father, and brother. We note that, while Illinois Supreme

Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires the appellant to include in its brief a statement

of facts containing "the facts necessary to an understanding of the case, stated accurately and

fairly without argument or comment, and with appropriate reference to the pages of the record on

appeal [in the proper format]." Breanne's brief fails to comply with this rule. Her statement of

facts amounts to a nine-page recitation of the procedural history with no meaningful discussion

of the trial evidence. Indeed, Breanne titles this section of her brief "Statement of Facts From

The Common Law Record" and includes no citation in this section to the report of proceedings

until the final paragraph. In that final paragraph, Breanne cursorily recounts a few excerpts of the

GAL's recommendation, to which the GAL testified at trial, and Stephen's testimony in which

he acknowledged the amount he paid in temporary child support and the amount he saved in his

retirement account over a certain time period. While Illinois Supreme Court Rule 341(i) (eff.

Oct. 1, 2020) provides that a statement of facts need not be included in an appellee's brief

"except to the extent that the presentation by the appellant is deemed unsatisfactory," we note

that Stephen did not otherwise include a statement of facts in his appellee's brief.

¶ 15            We have independently reviewed the over 4000-page record on appeal and note that,

while the entirety of the report of proceedings spans approximately 2000 pages, the actual trial

testimony from witnesses encompasses a relatively small portion of those pages. Ultimately, in

addition to the GAL's testimony regarding her recommendation set forth above, the evidence

included testimony and documents regarding the parties' parenting time with A.G. and A.G.'s

6

relationship with the parties and extended family members; Stephen's relationship with Alexandria; the parties' communications regarding A.G.'s health, education, and activities; the parties' work schedules, employment history, and financial information; child-care arrangements; and A.G.'s education. Where relevant, we discuss the evidence in our recitation of the trial court's judgment and analysis of Breanne's arguments on appeal.

¶ 16    Following trial and before entry of judgment, Breanne filed several additional motions. On November 14, 2022, Breanne filed a motion to enjoin Stephen from arranging any health care treatment for A.G. and to mandate the use of "Our Family Wizard" (OFW) to communicate. On January 5, 2023, Breanne filed an emergency motion to assign the dependent exemption and child-care credit for tax purposes. On January 10, 2023, Breanne filed a motion, pursuant to section 21-101 of the Code of Civil Procedure (Code) (735 ILCS 5/21-101 (West 2022)), to change A.G.'s name to a hyphenated last name to incorporate Breanne's last name (although she later argued that a different standard applied in paternity cases). On January 30, 2023, Breanne filed a motion to reopen proofs for the court to consider evidence relating to: (1) Stephen's motion to appoint a therapist for A.G., (2) Breanne's motion to use OFW to communicate and to enjoin Stephen from arranging any health care treatment for A.G. (centering on a dispute as to the choice of A.G.'s dentist), and (3) to inform the court that Stephen and Alexandria were expecting a child in May 2023. On March 13, 2023, Breanne filed a petition for indirect civil contempt of court against Stephen and his counsel for failure to disclose the pregnancy. Then, on May 25, 2023 Breanne filed an emergency motion for temporary possession of A.G., an evidentiary hearing pertaining to the birth of Stephen's new baby, and for a hearing on an emergency petition for indirect civil contempt for failure to communicate through OFW. The

matters were ultimately continued and ruled upon postjudgment or found moot, as discussed below.

¶ 17                                    D. Trial Court's Judgment

¶ 18          On April 7, 2023, the trial court issued an extensive oral ruling with supporting findings, awarding the parties joint decision-making responsibility for A.G. and 50/50 parenting time and noting that it had considered all the testimony, exhibits, the GAL's testimony and report, arguments of counsel, and all relevant statutory provisions. Following the oral ruling, the trial court directed Stephen's counsel to draft a proposed judgment in accordance with the court's oral ruling and findings. Following Stephen's submission of the draft proposed judgment to the court, Breanne filed a motion to enter an attached corrected judgment. At a May 8, 2023, hearing, the trial court reviewed the draft proposed judgments with counsel for both parties and ordered Stephen's counsel to prepare a revised draft proposed judgment in accordance with the court's ruling to be circulated to the court and counsel. The trial court also continued the case to June 8, 2023, for entry of judgment and to set a briefing schedule and hearing date on the remaining pending matters. On June 6, 2023, Stephen's counsel submitted an updated draft proposed judgment as ordered; the record reflects that Breanne's counsel continued to dispute the content.

¶ 19          On June 7, 2023 (a day before the scheduled June 8, 2023, date for entry of judgment), when the matter was scheduled for presentment on several of Breanne's motions, and where counsel for both parties were present, the trial court entered the final judgment. In accordance with the trial court's April 7, 2023, oral ruling and findings, the June 7, 2023, written judgment awarded the parties joint decision-making responsibility for A.G. and 50/50 parenting time. In the written judgment, the trial court first found, "Breanne offered evidence and made allegations during the closing arguments that Stephen was secretive, untruthful, uncommunicative, and

8

untrustworthy [] and that the parties did not have the ability to jointly parent the minor child. The Court did not find any credible evidence from the trial that Stephen was being secretive." The court further found that, "despite argument to the contrary, neither party was forced into equal parenting time." The trial court also noted the extensive procedural history of the case, appointment of the GAL, and the GAL's recommendations.

¶ 20    Turning to the first issue—decision-making responsibility, after considering A.G.'s best interests and examining the 15 enumerated factors set forth in section 602.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5(c) (West 2020)), the trial court awarded the parties joint decision-making responsibility for A.G. with respect to A.G.'s education, health, religion, and extracurricular activities and included a procedure for disagreement on health issues to be submitted to a mediator. The trial court noted that certain factors were not at issue given the court's findings that both parents are mentally and physically healthy, there is no threat of physical violence and no abuse, and neither parent is a sex offender. The trial court found that another factor—the wishes of the child—did not carry significant weight given A.G.'s young age and the limited testimony regarding this factor.

¶ 21    Regarding the parents' ability to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making, the trial court found no issue raised in the areas of religion and extracurricular activities. With respect to A.G.'s healthcare, the trial court noted evidence that the parties have discussed medical and health appointments for A.G., that both parties have made appointments and attended appointments for A.G., and that, while "questions have been raised regarding the making of appointments and healthcare," there were no substantial issues that existed. As for A.G.'s education, the trial court noted the dispute between the parties as to where A.G. will attend school but that the parties

otherwise "seem to be able to work together on education issues." While the GAL recommended that A.G. attend school in Stephen's district due to the convenient distance between the parties, the trial court rejected the recommendation and found that "Breanne will be designated the child's primary residential custodial parent for school purposes only" and that A.G. shall attend school for the school district in which Breanne resides.

¶ 22    Addressing the remaining factors, the trial court found that both parents had equally participated in significant decision-making as to A.G. from the time of A.G.'s birth to the present. In addition, both parents agreed to equally share significant decision-making as to A.G. from the time of A.G.'s birth until trial, and "[t]heir course of conduct and status quo was that they discussed and made all decisions together until the trial commenced." Thus, this factor benefitted both parties. An additional factor that favored both parties was that A.G. is adjusted to both parents' homes. Moreover, the parties live approximately six miles apart and equally attend to the daily needs of A.G., who does not have any special needs.

¶ 23    Regarding the parents' wishes, the trial court found that this factor did not benefit either party. Specifically, the trial court noted Breanne's request for sole decision-making in all enumerated categories, despite the parties having made decisions jointly throughout A.G.'s life, as well as Stephen's statement that the parties have agreed in their decision-making for A.G. except when choosing a school district, obtaining emergency medical treatment, and attending counseling. With respect to the parties' willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and child, the trial court found that the parties had in the past "facilitated and encouraged the close continuing relationship" and that each party has the ability to do so. "[T]here is a difference between the ability and willingness of doing that, but the Court finds the parties have the ability to do it." However, the court found that

10

"there were clearly times when the parents did work well together, and the parties can facilitate [a] shared decision-making arrangement." The trial court found that no restrictions on decision-making for either parent was appropriate.

¶ 24    In considering the remaining relevant factors, the trial court concluded that "the parties have been able to equally co-parent and make decisions for the child for the entirety of the child's life, except as to choice of school district." The parties "have 50/50 parenting time, the parties live close to one another, the parenting schedule in effect has been working, neither party was forced into 50[/]50 parenting time, the maximum involvement of both parties is beneficial to the child."

¶ 25    Turning to the second issue—parenting time, after considering A.G.'s best interests and examining the 17 enumerated factors set forth in section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2020)), the trial court awarded the parties 50/50 parenting time. The inapplicable factors noted above (which are also factors to consider in awarding parenting time) were not at issue, nor was the terms of a parent's military family care plan. Likewise, the willingness and ability of each parent to place A.G.'s needs ahead of their own needs was not an issue, as the trial court found that both parties exhibited an ability to put A.G.'s needs first. With respect to the wishes of each parent, the trial court found that "there is evidence that both parents agreed to equal parenting time with the child" and "[t]here was no credible evidence that either party was forced into equal parenting time." The trial court further noted, however, that "as trial commenced, Breanne expressed she wanted a 60-40 parenting time schedule in her favor," while "Stephen maintained his wishes to have an equal parenting time schedule throughout the trial, and consistent with the GAL's recommendations and consistent with the pattern followed by the parties until trial." Regarding the amount of time each parent spent performing caretaking

11

functions in the 24 months preceding the filing of any petition for allocation of parenting responsibilities, the trial court found that Breanne and Stephen spent an equal amount of time performing these functions in the 24 months prior to the filing of this action. In addition, regarding any prior agreement or course of conduct between the parents relating to the caretaking functions, the trial court found that "both parties consented to and followed an equal share of caretaking functions for the child during the entirety of the child's life," and thus, this factor benefitted both parties.

¶ 26 As for the interaction and interrelationship of the child with parents and siblings and with any other person who may significantly affect the child's best interests, the trial court found that A.G. has a loving relationship with both parents and benefits from their extended family relationships, and thus, this factor favored both parties. The trial court further found that A.G. was adjusted to both homes, preschool, and the community and that A.G.'s needs are being met by both parents—a factor favoring both parties. Breanne and Stephen live in the same town, and the distance between their home is approximately six miles.

¶ 27 The court concluded that no restriction on parenting time for either parent was appropriate. As for the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, the trial court found that "both parties can and have facilitated and encouraged a close and continuing relationship between the other parent and the child." While there were "communication issues between the parties that began towards the end of trial," the "change in communication was because of Breanne's attorney's direction, without consent by Stephen, [*sic*] Breanne only communicated via [OFW]." The trial court thus took into consideration that "[t]he parties' poor communication is a result of the self-imposed requirement of [OFW]." Finally, with respect to any other relevant

12

factor, the trial court found that "the parties have been able to equally co-parent and have shared equal parenting time in the past." Following its award of 50/50 parenting time, the trial court set forth an extensive schedule for weekly, weekend, and holiday time.

¶ 28    As a final matter, the trial court entered an award of $278 in monthly child support. Noting that "Stephen has been paying child support in varying amounts through most of the litigation," the trial court denied Breanne's request that child support be retroactive to the March 9, 2020, filing date of her motion for child support. Rather, the trial court ordered Stephen to pay child support retroactive only to January 1, 2021, and that he be credited for the total of his payments from January 1, 2021, to date. The trial court also allocated responsibility for child-related expenses as 62% to Stephen and 38% to Breanne, and awarded Stephen retroactive contribution to the health insurance premiums for A.G.

¶ 29                    E. Posttrial Proceedings

¶ 30    On June 27, 2023, Breanne filed a motion for immediate possession of A.G. and for an expedited evidentiary hearing on her motion to reopen proofs. On this date, Breanne also filed a motion to reconsider, vacate, and amend the final judgment. She argued that the trial court entered a *sua sponte* judgment that violated her due process rights, disputed the child support calculations and cost of health insurance, challenged the trial court's finding regarding the parties' past joint parenting, and sought to reopen proofs to present evidence regarding the birth of Stephen's new child. The next day, on June 28, 2023, Breanne also filed a separate motion to vacate the judgment on the basis of the purported due process violation. Breanne subsequently moved to amend the motion to include as exhibits photographs of a sign on Stephen's door requesting visitors not to knock or ring the doorbell because "[t]he dog will Bark and the Baby Will Cry."

13

¶ 31 On June 28, 2023, pursuant to the addition of courtrooms to the circuit's domestic relations division, this case was automatically reassigned to a new judge, who, on August 9, 2023, recused himself given the pending posttrial motions with respect to a trial over which he did not preside. The case was then transferred back to the judge who had presided over the trial in his capacity as presiding judge of the domestic relations division, at which point the case was reassigned to another judge pursuant to administrative order. Breanne filed a motion to vacate the reassignment, which was denied.

¶ 32 Meanwhile, on July 7, 2023, Breanne issued a subpoena to the daycare where Stephen was currently bringing A.G. for all documents and communications pertaining to A.G.'s care. On July 7, 2023, Breanne also filed an emergency motion to compel Stephen's deposition, to produce documents, and for indirect civil contempt for noncompliance with these purported discovery obligations. The attached document request set forth eleven categories of documents to be produced by Stephen, ranging from all pictures of his new child taken within 24 hours of the child's birth to every e-mail, text message, and other communication between Stephen and his girlfriend for the time period April 1, 2022, to the present, including but not limited to childcare arrangements for A.G. Breanne filed another petition for indirect civil contempt against Stephen on July 18, 2023, for failing to discuss in advance with Breanne a change in childcare. On July 19, 2023, Breanne issued a subpoena to Alexandria for the production of 10 categories of documents ranging from documents pertaining to her employment, communications between her and her employer, and the care of A.G.

¶ 33 On July 24, 2023, Stephen filed a motion for sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) for filing pleadings with the intent to harass Stephen, delay court

14

process, and needlessly increase of the cost of litigation. Breanne filed a motion to dismiss the sanctions claim as legally insufficient.

¶ 34    On September 6, 2023, the trial court denied Breanne's pending motion to compel discovery without prejudice and ruled, over Breanne's objection, that the pending motions would be heard without further evidence.

¶ 35    On October 19, 2023, the trial court entered an order (and amended order) with respect to certain pending motions. The trial court denied Breanne's motion to reconsider, vacate, and amend the judgment and her separate motion to vacate the judgment, with the exception of the arguments therein pertaining to child support, which it took under advisement. The trial court also took Breanne's motion for a name change under advisement. In addition, the trial court noted that the motion to reopen the proofs had already been denied, and with the exception of pending filings pertaining to contempt and sanctions (which were continued and/or set for hearing), the trial court either denied the remaining pending motions or found them moot.

¶ 36    Thereafter, on November 27, 2023, Breanne filed another petition for indirect civil contempt against Stephen for failing to facilitate electronic parenting time and refusing to communicate through OFW. Breanne also filed a motion to appoint a mediator. Following argument, on November 30, 2023, the trial court entered a written order, denying two of Breanne's pending motions and continuing the matters relating to contempt and sanctions. First, the trial court denied Breanne's motion to reconsider, vacate, and amend the judgment with respect to child support, rejecting Breanne's contention that the trial court relied upon *ex parte* communications in calculating child support, finding that the child support calculations were based upon the evidence presented at trial regarding the parties' income and in accordance with statutory guidelines, and holding that the court acted within its discretion in declining to make

15

the award retroactive to the filing date of Breanne's petition. Second, the trial court denied Breanne's motion for a name change, finding that Breanne did not meet her burden of establishing the necessity of a name change.

¶ 37       Breanne timely filed a notice of appeal.

¶ 38                                    II. ANALYSIS

¶ 39       On appeal, Breanne challenges the award of joint decision-making and 50/50 parenting time. She argues that the trial court's findings were against the manifest weight of the evidence, the timing of the entry of judgment violated her due process rights, and the reassignment of the case for ruling on posttrial motions was erroneous. Breanne also challenges the calculation of child support and child-related expenses, the retroactive date of the child support award, and the retroactivity of health insurance premiums. Breanne further argues that the trial court erred by not conducting an evidentiary hearing on her motion for a name change. Before turning to the merits of these arguments, we must first address this court's jurisdiction.

¶ 40                                    A. Jurisdiction

¶ 41       The appellant bears the burden of establishing our jurisdiction (see *In re Marriage of Salviola*, 2020 IL App (1st) 182185, ¶ 36), and Illinois Supreme Court Rule 341(h)(4) (eff. Oct. 1, 2020) requires the appellant's brief to set forth "a brief, but precise statement or explanation under the heading 'Jurisdiction' of the basis for appeal including the supreme court rule or other law which confers jurisdiction upon the reviewing court; the facts of the case which bring it within this rule or other law ***." Breanne's statement of jurisdiction fails to comply with this rule. She merely recounts the dates of the trial court's June 7, 2023, judgment, the trial court's November 30, 2023, order denying the posttrial motions, and her January 2, 2024, notice of appeal. She identifies neither the supreme court rule conferring jurisdiction on this court nor the

facts bringing the appeal within such rule. In addition, while Illinois Supreme Court Rule 341(i) (eff. Oct. 1, 2020) requires the appellee to provide a statement of jurisdiction when the appellant's statement is unsatisfactory, Stephen does not include any statement of jurisdiction in his brief.

¶ 42 We have an independent duty to consider our jurisdiction and dismiss this appeal if jurisdiction is lacking. See *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 213 (2009). Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017) states that "[a] judgment or order is not final and appealable while a Rule 137 claim remains pending unless the court enters a finding pursuant to Rule 304(a) [that there is no just reason for delaying either enforcement or appeal or both]." Here, the record reflects that the sanctions (and other) claims remain pending and that there was no request for, nor entry of, a Rule 304(a) finding.

¶ 43 That being said, Illinois Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016) provides that "[a] custody or allocation of parental responsibilities judgment" is immediately appealable without a Rule 304(a) finding notwithstanding that it does not dispose of an entire proceeding. We note that, in her notice of appeal and docketing statement, Breanne identifies Rule 304(b)(6) as the rule pursuant to which she has appealed. However, Rule 304(b)(6) only provides a jurisdictional basis to review the trial court's judgment with respect to decision-making responsibilities and parenting time. See *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 29 (an allocation of parental responsibilities judgment is a judgment that allocates both parenting time and significant decision-making responsibilities with respect to the minor child). Accordingly, we have jurisdiction under Rule 304(b)(6) only to review the trial court's award of joint decision-making responsibility and 50/50 parenting time. We express no opinion on the merits of Breanne's other arguments or on the sanctions claim still pending in the trial court.

17

¶ 44                              B. Allocation of Parental Responsibilities

¶ 45            A reviewing court will not disturb the trial court's ruling on the allocation of decision-making responsibilities and parenting time unless that decision is against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶¶ 47, 53, 59. A decision is against the manifest weight of the evidence only if an opposite conclusion is apparent or if the findings appear unreasonable, arbitrary, or not based on the evidence. *Id.* ¶ 47. Sections 602.5 and 602.7 of the Act (750 ILCS 5/602.5, 602.7 (West 2020)) govern decisions regarding the allocation of decision-making responsibilities and parenting time, respectively, and provide that the determinations must be made according to the child's best interests. *Jameson*, 2020 IL App (3d) 200048, ¶¶ 47, 53. " '[T]here is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64 (quoting *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25). A reviewing court's function is not to reweigh evidence or assess witness credibility. *Jameson*, 2020 IL App (3d) 200048, ¶ 51.

¶ 46            Initially, we reject Breanne's arguments that the timing of the entry of judgment violated her due process rights and that the reassignment of the case for ruling on posttrial motions was erroneous. First, contrary to Breanne's characterization of the June 7, 2023, judgment as "*sua sponte*," the trial court entered the judgment in accordance with its extensive prior oral ruling and findings, after instruction to counsel to submit the draft proposed judgment following the parties' submission of competing drafts, and after counsel for Breanne had received an advance copy. That counsel for Breanne apparently unsuccessfully sought further revisions did not make the judgment *sua sponte*. As such, Breanne's reliance upon *In re Marriage of Burns*, 2019 IL App

18

(2d) 180715, ¶ 31, where the trial court's *sua sponte* award of parenting time not requested in the underlying petition, amounted to a due process violation, is misplaced. Ultimately, "[a] trial court has inherent authority to control its docket." *Dolan v. O'Callaghan*, 2012 IL App (1st) 111505, ¶ 65. Here, the trial court acted well within its authority in entering written judgment following its oral pronouncement.

¶ 47 Second, Breanne's challenge to the reassignment of the case rests on the incorrect premise that the judge who presided over the trial recused himself. This is not what happened; rather, following entry of the June 7, 2023 judgment, the matter was reassigned pursuant to administrative order after new courtrooms were added to the circuit's domestic relations division. Breanne provides no persuasive argument to support her challenge to this administrative reassignment.

¶ 48                                1. Decision-Making

¶ 49 We turn to Breanne's challenges to the award of joint decision-making responsibility and 50/50 parenting time. The trial court is required to allocate decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5(a) (West 2020). The significant issues affecting the child for which the court shall allocate decision-making responsibility include education, health, religion, and extracurricular activities. *Id.* § 602.5(b) (1-4). The court shall consider all relevant factors, including the following factors enumerated in section 602.5(c) of the Act:

> "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;

19

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that my affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." *Id.* § 602.5(c).

¶ 50        The trial court considered the witness testimony, exhibits, and the GAL's recommendation and conducted a detailed analysis of each of these factors in coming to its allocation determination. This included noting instances of the parties' cooperation relating to A.G.'s health and that, notwithstanding the dispute over the choice of A.G.'s school, the parties appeared able to work together on educational issues. The trial court further observed that, until the time of trial, the parties had discussed and jointly made decisions with respect to A.G. The trial court found that A.G. was adjusted to both parents' homes, which are in close proximity to each other. The trial court also found that the parties had in the past facilitated and encouraged a close continuing relationship between the other parent and A.G. and that each party has the ability to do so. Moreover, given that the parties had been able to equally co-parent and make decisions for A.G. for the entirety of the child's life, that neither party was forced into their parenting time schedule, and that the maximum involvement of both parties is beneficial to A.G., the trial court awarded joint decision-making responsibility.

¶ 51        Breanne challenges the trial court's decision as lacking evidentiary support. According to Breanne, the parties have no ability to communicate, cooperate, or coparent and there was no evidence in the record of prior cooperation. However, the GAL reported on such instances of cooperation following her investigation. Breanne sets forth a list of 55 issues with respect to A.G. on which the parties purportedly disagree. The list ranges from disagreement over the use of OFW to communicate rather than through text message or e-mail, to disagreement over which preschool district A.G. would attend (an issue on which Breanne prevailed), to statements such as "Stephen never budged on 50-50,"; "Stephen won't talk to Breanne"; and "Stephen ignores Breanne's opinions." However, Breanne's discussion of the conflict between the parties rests in large part on her citation to the litany of motions and petitions she filed prior to trial, during trial,

21

while awaiting judgment, and postjudgment. Simply put, these are Breanne's pleadings, not evidentiary support of lack of cooperation. Breanne has presented this court with no basis upon which to conclude that the trial court's decision to award joint decision-making responsibility was against the manifest weight of the evidence.

¶ 52                                    2. Parenting Time

¶ 53        Like the allocation of decision-making responsibilities, the trial court must allocate parenting time according to the child's best interests. 750 ILCS 5/602.7(a) (West 2020). In making this determination, the court shall consider all relevant factors, including the following:

> "(1) the wishes of each parent seeking parenting time;
>
> (2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;
>
> (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;
>
> (4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;
>
> (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;
>
> (6) the child's adjustment to his or her home, school, and community;
>
> (7) the mental and physical health of all individuals involved;
>
> (8) the child's needs;

22

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b).

¶ 54        Again, the trial court considered the witness testimony, exhibits, and the GAL's recommendation and conducted a detailed analysis of each of these factors in coming to its determination as to parenting time. The trial court found that the parties had previously agreed to

23

equal parenting time which they followed until trial. Breanne argues that this was only because of "Stephen's insistence on an equal schedule." However, to the extent this was disputed, the trial court resolved the issue in Stephen's favor, specifically finding that, "despite argument to the contrary, neither party was forced into equal parenting time." Breanne does not provide a basis to upend this determination, and we are not at liberty to simply reweigh evidence or assess witness credibility. See *Jameson*, 2020 IL App (3d) 200048, ¶ 51.

¶ 55　　　　The trial court further found that A.G. has a loving relationship with both parents and benefits from extended family relationships; was adjusted to both homes, preschool, and community; and that A.G.'s needs are being met by both parents—a factor favoring both parties. Also, the close proximity of the parties' homes favored equal parenting time. The trial court attributed the parties' recent "communication issues" to the direction of Breanne's counsel to communicate with Stephen only through OFW.

¶ 56　　　　Breanne contends that courts have "frowned" on 50/50 parenting time, citing, *inter alia*, *In re Marriage of Virgin*, 2021 IL App (3d) 190650. In *Virgin*, this court noted that 50/50 joint parenting time has traditionally been viewed with caution and that, "[i]n cases where the evidence clearly showed that parents had too much animosity to be able to cooperate, 50/50 arrangements have been set aside." *Id.* ¶ 47 (citing cases). In *Virgin*, a 50/50 parenting time order was reversed where the record was "replete with evidence that the parties have too much animosity to sufficiently cooperate," and where the GAL had testified that the case presented "one of the highest conflict cases he had ever seen in his experience as a GAL and attorney." *Id.* ¶ 49.

¶ 57　　　　However, in *Virgin*, we also observed that, "where the record shows that the parties are reasonably loving and capable parents who are sufficiently able to cooperate even though each

24

party attempted to prove the other was less capable, the 50/50 arrangement *could be* upheld." (Emphasis in original.) *Id.* ¶ 47 (citing cases). For instance, in *In re Marriage of Perez*, 2015 IL App (3d) 140876, this court upheld a 50/50 parenting schedule where the parents were capable, cooperative, and lived in close proximity to each other; the schedule accounted for the parties' work schedules and was working well; there was no indication that the child would suffer psychologically or emotionally under the shared schedule; neither party's residence was unsuitable for the child; and the child did not have a strong preference against the 50/50 schedule. *Id.* ¶ 33. Similar to *Marriage of Perez*, the trial court here noted that the parties live in close proximity and found the parties mentally and physically healthy, that A.G. was adjusted to both homes, that the 50/50 parenting time schedule "has been working," and that "the maximum involvement of both parties is beneficial to the child." In sum, having reviewed the record, we cannot say that the trial court's allocation of parenting time was against the manifest weight of the evidence.

¶ 58                                    III. CONCLUSION

¶ 59          The judgment of the circuit court of Du Page County is affirmed.

¶ 60          Affirmed.